In the

# United States Court of Appeals

## for the Seventh Circuit

No. 21-2691

PETER JOKICH, M.D.,

*Plaintiff-Appellant*,

*v.*

RUSH UNIVERSITY MEDICAL CENTER,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18 C 7885 — **Joan H. Lefkow**, *Judge*.

ARGUED FEBRUARY 23, 2022 — DECIDED JULY 28, 2022

Before SYKES, *Chief Judge*, and FLAUM and KANNE[*], *Circuit Judges*.

SYKES, *Chief Judge*. Rush University Medical Center fired Dr. Peter Jokich, a distinguished radiologist who had worked at the hospital for nearly two decades. Dr. Jokich

[*] Circuit Judge Kanne died on June 16, 2022, and did not participate in the decision of this case, which is being resolved under 28 U.S.C. § 46(d) by a quorum of the panel.

sued Rush, asserting claims under Title VII of the Civil Rights Act of 1964 and Illinois law. He contends that his termination and other actions taken by Rush were unlawful retaliation for his participation in a colleague's Title VII lawsuit and his opposition to discriminatory practices at Rush. He also contends that Rush's actions violated the procedures set out in his employment contract and that Rush failed to adhere to an agreement guaranteeing his employment for an additional year.

The district judge entered summary judgment for Rush on all claims. We affirm. The record supports Rush's contention that its actions were taken because of Dr. Jokich's clashes with his colleagues; it does not support Dr. Jokich's claim that he was fired because of his participation in activity protected by Title VII. Nor does the record support Dr. Jokich's claims for breach of contract. Rush's actions comported with his employment contract, and the agreement extending his employment was subject to a condition precedent—approval by the hospital's Board of Trustees—that was never satisfied and that Rush did not waive.

## I. Background

Dr. Peter Jokich is an accomplished radiologist who specializes in breast imaging. He was recruited to Rush in 2001 by Dr. Larry Goodman, then the hospital's Dean, to improve Rush's struggling breast-imaging practice. Over the next two decades, Dr. Jokich built a highly successful practice and until his final year of employment, served as the director of the hospital's Division of Breast Imaging. That changed in August 2018 when Rush stripped him of this role, cut his pay by over $200,000, and provided notice that his employment contract would not renew when it expired in June

2019. Dr. Jokich contends that these actions resulted in several breaches of contract and were unlawful retaliation for his participation in activity protected by Title VII.

## A. The Employment Contract

Dr. Jokich and Rush had an employment contract called a "Faculty Employment Agreement." The agreement, standard for doctors employed by Rush, set Dr. Jokich's duties and base salary and provided for a one-year employment term. The agreement automatically renewed on July 1 each year unless one party provided 120 days' notice of the intent to terminate the agreement. Rush could terminate the agreement mid-term only for cause. However, Rush could modify Dr. Jokich's pay and duties with 60 days' notice.

In addition to the Faculty Employment Agreement, Dr. Jokich's employment was at times governed by "letter agreements," which were written on Rush letterhead and sent to Dr. Jokich for his signature. Dr. Jokich specially negotiated for the letter agreements, which provided for multiyear employment terms—superseding the Faculty Employment Agreement's one-year term—and annual bonuses and special benefits for him and his breast-imaging team. Absent an active letter agreement, Dr. Jokich's employment was governed solely by the Faculty Employment Agreement.

In August 2016 Dr. Jokich signed a letter agreement extending his employment through June 30, 2020. (We call this the "2016 letter agreement" or "2016 agreement.") The enforceability of the agreement was subject to a condition precedent: approval by Rush's Board of Trustees. The Board of Trustees had to approve the pay of very highly compen-

sated doctors like Dr. Jokich because the hospital, a tax-exempt, not-for-profit entity, risked liability under antikick-back laws if it overcompensated a physician relative to his clinical productivity.

At an October 2016 meeting, the Board of Trustees considered and declined to approve the 2016 letter agreement. It worried that Dr. Jokich's clinical productivity was too low to warrant the bonus compensation, exposing Rush to the risk of liability. After the Board's decision, Rush tried to craft an amendment to the 2016 agreement acceptable to both Dr. Jokich and the Board. Dr. Jokich personally participated in the negotiations, sending several e-mails in March 2017 suggesting changes that he hoped might assuage the Board's legal concerns.

In April 2017 Rush sent Dr. Jokich a proposed amendment to the 2016 agreement. The proposal, drafted with recommendations from the Board of Trustees, sought to add productivity benchmarks for Dr. Jokich's practice. He would be eligible for the bonus compensation set out in the 2016 agreement only if the benchmarks were met. Dr. Jokich found the productivity requirements unacceptable and immediately sent an e-mail rejecting the offer.

In June Rush returned with another proposed amendment to the 2016 agreement. This offer (which we call the "2017 amendment") likewise added productivity benchmarks, albeit less demanding ones, limiting Dr. Jokich's eligibility for the bonus compensation set out in the 2016 agreement. The amendment invited Dr. Jokich to accept with his signature. But Dr. Jokich did not sign or otherwise signal acceptance, and unlike his rejection of the first proposed amendment, this time he told no one about his decision. At

his deposition he agreed that he had not accepted the 2017 amendment because "[i]t was basically the same letter that [he] had earlier said [that he] wouldn't sign."

Although the Board of Trustees had not approved the 2016 agreement and although Dr. Jokich had not accepted the 2017 amendment, Rush provided Dr. Jokich and his team bonuses and benefits consistent with the 2016 agreement. This included paying Dr. Jokich a yearly bonus in October 2017. Dr. Ranga Krishnan, Rush's Dean and the person responsible for approving Dr. Jokich's bonuses, explained in a declaration that he signed off on the bonus because he mistakenly believed that Dr. Jokich had accepted the 2017 amendment.

## B. Conflict and Termination

The parties have entered a mountain of evidence cataloging a series of conflicts between Dr. Jokich and his colleagues. We will simplify where we can and focus on the key events. In February 2018 Dr. Jokich e-mailed Dr. Krishnan, Dr. Larry Goodman (who by then was Rush's CEO), and Rush's head of surgery to complain about the hospital's breast surgeons. Dr. Jokich urged the administrators to find an adequate replacement for a recently retired breast surgeon and criticized the performance of the remaining breast surgeons, two of whom are female.

The head of surgery showed the e-mail to the two surgeons so they could gather evidence to rebut Dr. Jokich's suggestion that their performances were subpar. After learning of the e-mail, the two female surgeons and Dr. Paula Grabler, a radiologist who worked under Dr. Jokich, raised concerns about him with the hospital's

human-resources department. They complained about their working relationship with him generally and suggested that he may have engaged in sex discrimination.

Rush's response to the complaints was twofold. First, Dr. Krishnan made changes to the reporting hierarchy. Dr. Grabler would now report to Dr. Robert DeCresce, the acting director of the Rush Cancer Center, rather than Dr. Jokich. Dr. Jokich would now report to Dr. DeCresce as well rather than Dr. Sharon Byrd, the chair of the Department of Diagnostic Radiology and Nuclear Medicine, which housed Dr. Jokich's Division of Breast Imaging. Second, Rush hired an outside investigator to assess whether Dr. Jokich had violated hospital policy or engaged in sex discrimination. In April 2018 the investigator returned a report concluding that Dr. Jokich had done neither.

Eight days after the investigator submitted her report, Dr. DeCresce, who had received a copy of the report, placed Dr. Grabler in charge of supervising breast-imaging facilities at Rush's satellite locations. The responsibility formerly belonged to Dr. Jokich, and he considered the change a demotion. At his deposition Dr. DeCresce explained that he made the change because others involved in planning the satellite facilities had said that Dr. Jokich had been difficult to work with.

Dr. Jokich claims that it was really the investigator's report that motivated Dr. DeCresce to make the change. Specifically, the report took note of Dr. Jokich's theory that his female colleagues had ginned up their complaints at the urging of Rush leadership for the purpose of dissuading him from testifying in another employee's discrimination lawsuit against Rush. That suit, filed in November 2017 by Norma

Melgoza, a Hispanic administrator, asserted claims under Title VII and the Equal Pay Act. During discovery, Melgoza had named Dr. Jokich (along with 111 others) as a potential witness. Other than appearing on the witness list, Dr. Jokich was not involved in Melgoza's case.

According to Dr. Jokich, Dr. DeCresce would have been unhappy to learn about Dr. Jokich's potential involvement in Melgoza's lawsuit. The previous year Dr. DeCresce had interviewed Melgoza for an internal promotion, and she claimed that he put on a "Trump mask" during the interview. Melgoza told Dr. Jokich about the incident, and he encouraged her to complain to human resources. In December 2017 after Melgoza had filed her lawsuit, Dr. Jokich told human-resources personnel who were investigating the incident that he had told Melgoza that he thought the conduct was "unbelievable and unprofessional." He did not, however, say that Dr. DeCresce had discriminated against her.

Returning to 2018 in the timeline, Dr. Jokich's conflicts with Dr. Grabler continued. On May 21 she gave a presentation on a breast-imaging technology called "tomosynthesis" (or 3D mammography). Dr. Jokich attended the presentation and made no comments while there. But the next day he criticized the presentation in an e-mail sent to 60 colleagues, including Drs. DeCresce, Goodman, and Krishnan, but not including Dr. Grabler. Dr. Jokich suggested that tomosynthesis was a gimmick to increase revenue at the expense of patient safety and expressed broader concerns that money was improperly driving the hospital's decisions regarding patient care.

A few hours later, Dr. DeCresce e-mailed Dr. Krishnan about "Dr. Jokich's latest outburst concerning his colleagues." He raised concerns about Dr. Jokich's behavior, concluding: "I believe it is time for a change in mammography. … If we want to be a leading cancer center[,] we need individuals who will work together to achieve the goal. Pete is not one of those people." Dr. Krishnan added Dr. Goodman to the e-mail chain, and Dr. Goodman responded to both, saying: "I totally support your judgement [sic] concerning the individuals that report to you."

Later that week on May 26, 2018, Dr. DeCresce contacted human resources and explained the decision to terminate Dr. Jokich's employment. The hospital engaged outside counsel to help carry out the termination, and by June 6 a draft termination letter was ready.

June 11, however, brought another e-mail from Dr. Jokich. This time he wrote to three Rush executives, including Dr. Goodman, saying that he was aware of "serious discrimination issues and unfair employment practices that have occurred, and are occurring, at Rush involving at least gender, age, and national origin." He then filed a formal complaint with human resources alleging specific instances of unlawful practices. The only ones relevant here are the alleged discrimination underlying Melgoza's already pending lawsuit and retaliation against Dr. Jokich for his supposed involvement in the case.

Dr. Goodman wanted to learn more about the issues raised by Dr. Jokich before moving forward with the termination. To that end, Rush hired an outside investigator to look into the claims. On July 29 the investigator returned a report concluding that Dr. Jokich's complaints were merit-

less. With that, according to Rush, it was time to proceed with the previously planned termination.

On August 8 Drs. DeCresce and Krishnan met with Dr. Jokich and presented a choice: resign under a special agreement or face termination. The special agreement was essentially a severance package that would pay Dr. Jokich his salary of nearly $660,000 through June 2020 and leave him free to take any other job. It also included mutual nondisparagement provisions and a positive recommendation from Dr. Goodman. On August 21 Dr. Jokich declined the offer.

The next day Dr. DeCresce informed Dr. Jokich by letter that he was removed as the director of the Division of Breast Imaging and provided notice that in 60 days his salary would be reduced to about $450,000 to reflect the change in duties. The letter also provided notice that Rush would terminate the Faculty Employment Agreement at the end of its term in June 2019, ending Dr. Jokich's employment at Rush.

## C. Proceedings Below

Dr. Jokich responded with this lawsuit. He sued under Title VII, asserting that Rush's actions were unlawful retaliation for his participation in Melgoza's lawsuit and his opposition to discriminatory practices at Rush. He also brought contract claims under Illinois law. His primary contention is that Rush breached the 2016 letter agreement by employing him through only June 2019, not June 2020. He also claimed that Rush violated the Faculty Employment Agreement by terminating him mid-term without cause and by allowing

Dr. DeCresce, rather than Dr. Byrd, the head of his department, to remove him as a division director.

The district judge entered summary judgment for Rush on all claims. On the Title VII claim, she determined that some of the challenged actions were not adverse employment actions. For those that were, she determined that the evidence was insufficient to allow an inference that Rush took the actions because of Dr. Jokich's participation in protected activity.

The judge likewise determined that no reasonable fact-finder could conclude that Rush breached any contractual obligation to Dr. Jokich. Rush's actions complied with the Faculty Employment Agreement, and the 2016 letter agreement was subject to a condition precedent—approval by Rush's Board of Trustees—that was never satisfied. The condition was not waived by Rush, nor was the hospital estopped from enforcing it.

## II. Discussion

We review a summary judgment de novo, reviewing the record in the light most favorable to Dr. Jokich, the nonmoving party, and drawing all reasonable inferences in his favor. *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). Summary judgment is appropriate if there is no genuine dispute of material fact and Rush, the moving party, is entitled to judgment as a matter of law. *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019).

### A. Title VII Retaliation

Title VII makes it unlawful for an employer to retaliate against an employee because he opposes any employment practice proscribed by Title VII or because he participates in

an investigation or proceeding under Title VII. 42 U.S.C. § 2000e-3(a). To survive summary judgment on his retaliation claim, Dr. Jokich needed to provide evidence that (1) he engaged in activity protected by Title VII; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 464 (7th Cir. 2016).

To attempt to make his case, Dr. Jokich points to two sets of actions taken by Rush. The first is Dr. DeCresce's decision to transfer oversight of the satellite breast-imaging facilities to Dr. Grabler, which came about a week after an outside investigator's report noted Dr. Jokich's theory that his female colleagues had sought to dissuade him from testifying in Melgoza's lawsuit. Dr. Jokich claims that the report revealed his "participation" in Melgoza's lawsuit, prompting Dr. DeCresce to retaliate against him.

The judge determined that the transfer of supervisory responsibility was not a sufficient change to Dr. Jokich's duties to constitute an adverse employment action. Rush advances the same argument on appeal. For present purposes we put the dispute aside and focus on the other two elements of a retaliation claim.

Dr. Jokich's case falls short on both. First, he presented no evidence that he engaged in protected activity prior to the challenged action. In relevant part, § 2000e-3(a) protects an employee who "ma[kes] a charge, testifie[s], assist[s], or participate[s]" in a Title VII "investigation, proceeding, or hearing." To say that appearing with 111 others on a list of potential witnesses counts as "participation" in a lawsuit stretches the statutory language too far. *Cf. Hatmaker v.*

*Mem'l Med. Ctr.*, 619 F.3d 741, 746–47 (7th Cir. 2010) (analyzing the text of § 2000e-3(a) and concluding that participating in an internal investigation is generally not protected activity).

Insisting that he engaged in protected activity, Dr. Jokich emphasizes that he spoke with Rush's human-resources department about Dr. DeCresce wearing a "Trump mask" when interviewing Melgoza. That conversation was not protected activity because Dr. Jokich did not claim that Dr. DeCresce had discriminated against Melgoza at all, let alone on the basis of a protected characteristic. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."). Nor does the conversation with human resources do anything to transform Dr. Jokich's mere appearance on a witness list into protected participation in Melgoza's suit.

Even if we assume that Dr. Jokich engaged in protected activity, he would still need evidence that doing so motivated Rush to take the challenged action. Specifically, Dr. Jokich must show that Rush would not have transferred his duties to Dr. Grabler but for his supposed participation in Melgoza's lawsuit. *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996). But-for causation may be inferred from circumstantial evidence, although Rush may rebut the inference with evidence of a nondiscriminatory explanation for the challenged action. *See Tomanovich*, 457 F.3d at 663. If Rush does so, the burden returns to Dr. Jokich to show that

the hospital's nondiscriminatory explanation is pretextual. *McKenzie*, 92 F.3d at 483.

Temporal proximity between protected activity and an adverse employment action can support an inference of causation between the two. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015). Suspicious timing alone, however, is generally insufficient to establish a retaliatory motivation. *Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 751 (7th Cir. 2009) (per curiam). Moreover, any inference of causation supported by temporal proximity may be negated by circumstances providing an alternative explanation for the challenged action. *See, e.g.*, *Parker v. Brooks Life Sci., Inc.*, No. 21-2415, 2022 WL 2721059, at *4 (7th Cir. July 14, 2022); *Sun v. Bd. of Trs.*, 473 F.3d 799, 816 (7th Cir. 2007).

In this case, there is insufficient evidence to infer a causal link between the supposed protected activity and the transfer of responsibility to Dr. Grabler. Suspicious timing, at most, is all there is, and without more a reasonable factfinder could not infer a retaliatory motivation for the action. This is especially so in light of the competing explanation that those working at the satellite locations found Dr. Jokich difficult to work with, which Dr. Jokich has not shown to be a pretext.

The second set of actions that Dr. Jokich challenges are the August 2018 decisions to remove him as a division director—with an associated pay cut of over $200,000—and to not renew his Faculty Employment Agreement. Dr. Jokich claims that these actions were taken in retaliation for his June 2018 complaints about discriminatory practices at Rush. The pay cut and termination are plainly adverse employment actions. *See Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54

(7th Cir. 2011). And we assume for present purposes that Dr. Jokich's formal complaint about alleged discrimination was a "step in opposition to a form of discrimination that [Title VII] prohibits" qualifying as protected activity. *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (quotation marks omitted).

Dr. Jokich's trouble, again, is establishing a causal link between his protected activity and Rush's actions. Rush says that it decided to terminate Dr. Jokich in May 2018—when Dr. Jokich sent an e-mail to 60 colleagues criticizing Dr. Grabler's presentation and Rush generally—before his June complaints. A paper trail confirms this account: Dr. DeCresce told human resources about the decision on May 26, and by June 6 a draft termination letter was ready. The termination was halted, according to Rush, in response to Dr. Jokich's complaints about discrimination, which came shortly after the draft termination letter had been completed.

Dr. Jokich urges us to reject Rush's timeline, suggesting that the true decision to fire him was made after his June 2018 complaints. That would require an improbable series of events such as this: Rush decided in May 2018 to fire Dr. Jokich; engaged outside counsel to do so; drafted a termination letter; then—for reasons unexplained—had a change of heart and decided to keep him on; finally, Dr. Jokich lodged his complaints, provoking Rush to fire him (again, and to follow through this time). The story is tough to swallow in theory, and it's impossible to credit in fact because there is no evidence for it.

Even if we fully accept this unsupported back-and-forth-and-back-again hypothesis, Dr. Jokich still cannot win. The only evidence of a retaliatory motive would be arguably

suspicious timing between his June 2018 complaints and
Rush's August 2018 actions. That's not enough to make his
case. Pushing back, Dr. Jokich insists that his positive per-
formance reviews evince pretext on Rush's part. They don't.
Rush agrees that Dr. Jokich is an excellent doctor and has
always maintained that it fired him because of his conflicts
with colleagues. The judge properly granted Rush's motion
for summary judgment on the retaliation claim.

## B. Breach of Contract

Dr. Jokich contends that Rush's actions resulted in sever-
al breaches of contract under Illinois law. The district court
had supplemental jurisdiction over the state-law claims
pursuant to 28 U.S.C. § 1367(a) because they form part of the
same "case or controversy" as the Title VII retaliation claim.
Like the retaliation claim, the state-law claims center on
Rush's August 2018 actions against Dr. Jokich.

Dr. Jokich's primary contention is that Rush breached the
2016 letter agreement, which extended his employment
through June 2020, by employing him through only June
2019 when the Faculty Employment Agreement terminated.
The 2016 agreement, Dr. Jokich concedes, was subject to
approval by Rush's Board of Trustees, a condition precedent
that was never satisfied. Nonetheless, he argues that Rush
waived the condition precedent or is estopped from enforc-
ing it.

A condition precedent may be waived by the party
whom it was intended to benefit. *Downs v. Rosenthal Collins
Grp., L.L.C.*, 963 N.E.2d 282, 290 (Ill. App. Ct. 2011). Waiver
may occur either "expressly or by conduct indicating that
strict compliance with the condition[] is not required."

*Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 633 (7th Cir. 1992). Conduct implies waiver only when it is "wholly inconsistent with the clause or condition, thereby indicating [the] intent to abandon the contractual right." *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 679 (7th Cir. 2004) (quotation marks omitted). Put differently, "[a]n implied waiver of a right may be shown when the conduct of the person against whom waiver is asserted is inconsistent with any intention other than to waive the right." *Downs*, 963 N.E.2d at 290–91.

A party to a contract may likewise lose a contractual right by virtue of estoppel. Estoppel occurs when a party's "statement or conduct misleads another into the belief that a right will not be enforced and cause[s] him to act to his detriment in reliance on that belief." *Sphere Drake Ins.*, 376 F.3d at 679 (quoting *Old Sec. Life Ins. Co. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 740 F.2d 1384, 1392 (7th Cir. 1984)). The statement or conduct causing detrimental reliance need not be fraudulent in the legal sense or even done with the intent to mislead. *Ceres Ill., Inc. v. Ill. Scrap Processing, Inc.*, 500 N.E.2d 1, 7 (Ill. 1986). But the reliance of the party acting to his detriment must be reasonable. *Schwinder v. Austin Bank of Chi.*, 809 N.E.2d 180, 192 (Ill. App. Ct. 2004).

No express statement from Rush supports waiver or estoppel, so Dr. Jokich's arguments rely on Rush's conduct. The hospital provided him benefits and a bonus consistent with the 2016 agreement. Dr. Jokich argues that these actions implied waiver by indicating that Rush intended to abandon the condition that the Board of Trustees approve the contract. He further argues that Rush is estopped from enforcing the condition because, he claims, he would have left the

hospital if not for the belief, induced by Rush's conduct, that he had the assurance of a multiyear agreement.

Beginning with waiver, we agree that a party's performance or its acceptance of another party's performance may sometimes establish waiver of a condition precedent to the formation of a contract. *E.g.*, *Whalen v. K-Mart Corp.*, 519 N.E.2d 991, 994 (Ill. App. Ct. 1988); *H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1545–46 (8th Cir. 1989). We also agree that some of Rush's actions—providing certain benefits and paying an annual bonus—were consistent with the 2016 agreement.

Waiver of a condition precedent, however, requires more than just some actions consistent with the performance of the contract. It requires conduct "wholly inconsistent" with the condition. *Sphere Drake Ins.*, 376 F.3d at 679; *see also Downs*, 963 N.E.2d at 290–91. The record does not satisfy this demanding standard. After the Board of Trustees rejected the 2016 agreement, Rush worked to craft an amendment that the Board would accept. It did so openly with Dr. Jokich himself participating in the negotiations. Rush also entered unrefuted evidence that for several months in 2013 and 2014, it had provided Dr. Jokich benefits consistent with a prior letter agreement even though a new letter agreement had not been reached. Whatever the reason for Rush's provision of compensation consistent with the 2016 agreement—whether a mistake or an act of grace for a valued doctor—those actions cannot establish waiver where Rush otherwise demonstrated an unwillingness to waive the condition.

Dr. Jokich's estoppel argument fares no better. He could not have been misled into thinking that Rush would not enforce the condition precedent because, as just explained,

the hospital openly worked to gain the Board of Trustees' approval. What's more, he cannot show that he reasonably and detrimentally relied on a misrepresentation to stay at Rush. He learned that the Board had rejected the 2016 agreement and silently chose not to accept the 2017 amendment. He stayed at Rush anyway.

With the waiver and estoppel arguments knocked out, there is no basis for the enforceability of the 2016 agreement. And Dr. Jokich provides no argument for the enforceability of the 2017 amendment. (Indeed, he affirmatively disavows it.) Thus, the Faculty Employment Agreement controlled the employment relationship. It ran through June 2019, and consequently, Rush did not breach any contract by employing Dr. Jokich through only that date.

Dr. Jokich has two additional arguments for breach of contract. The first is that Rush breached the Faculty Employment Agreement by terminating him mid-term without identifying cause for doing so. The argument has no merit because Rush did not terminate Dr. Jokich mid-term. Rather, the hospital declined to renew the Faculty Employment Agreement (with 120 days' notice) at the end of its term. No cause was required for that nonrenewal. Rush did modify Dr. Jokich's duties and pay (with 60 days' notice) in the middle of the term. But the Faculty Employment Agreement specifically allowed the hospital to make these changes without cause; they are not, in any event, a "termination."

Second, Dr. Jokich argues that Rush violated its medical-staff bylaws by allowing Dr. DeCresce to remove him as a division director. (Rush concedes that the Faculty Employment Agreement incorporated the bylaws.) Bylaw 10.3-2(c) provides that a division director serves in the position

"solely at the discretion" of the chair of the department in which the division sits. By Dr. Jokich's reading of the bylaw, his removal as a division director could occur only if Dr. Sharon Byrd, the department chair, initiated the action.

Dr. Jokich's reading of the bylaw is far too stringent. Dr. DeCresce made the decision to remove Dr. Jokich as a division director with the support of Dr. Krishnan, Rush's Dean, and Dr. Goodman, Rush's CEO. Dr. Byrd later learned about the decision but did not seek to change it. Indeed, she explained at her deposition that she hardly interacted with Dr. Jokich in practice and was content for those who did to handle the situation. Whatever level of discretion the bylaw required Dr. Byrd to exercise, her decision to hand off the matter to others satisfied it.

The evidence was insufficient to prove a breach of contract on any theory. Accordingly, the judgment of the district court is AFFIRMED.