In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2302

KEVIN R. CARMODY,

*Plaintiff-Appellant*,

*v.*

BOARD OF TRUSTEES OF THE UNIVER-
SITY OF ILLINOIS, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Central District of Illinois.
No. 12-CV-2249 — **Michael P. McCuskey**, *Judge*.

ARGUED DECEMBER 3, 2013 — DECIDED MARCH 28, 2014

Before POSNER, MANION, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiff Kevin Carmody worked
for the University of Illinois for 25 years until he was fired for
reasons involving a security breach of the university's email
system. After unsuccessfully appealing his discharge,
Carmody filed this suit against the university's board of
trustees and several university officials claiming that they
violated his rights under the Due Process Clause of the

Fourteenth Amendment and under an Illinois statute designed to protect whistle-blowers. The district court dismissed Carmody's complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Carmody has appealed.

We review *de novo* a district court's grant of a motion to dismiss, construing the complaint in the plaintiff's favor. *Sung Park v. Indiana Univ. School of Dentistry*, 692 F.3d 828, 830 (7th Cir. 2012). While we take the facts alleged in the complaint to be true, we also consider attached exhibits and take into account any contradictions. *Phillips v. Prudential Ins. Co. of America*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). For a case at the pleading stage, we have here an unusually detailed record of events because the complaint includes numerous exhibits regarding Carmody's termination.

We conclude that the district court's dismissal was premature with respect to one aspect of Carmody's due process claim: that he was not given an adequate pre-termination hearing. Carmody has plausibly alleged that his pre-termination opportunity to be heard was meaningless because he could not answer the university's crucial questions or respond to its accusations without violating a state court order that required him not to discuss the key subject. The university acted to fire Carmody on the same day the state court modified its order to allow him to respond to the charges, so the modification came too late to help him. Also, Carmody has alleged that he was actually fired based in part on a charge for which he had no prior notice and opportunity to be heard. We therefore reverse this one portion of the district court's

judgment and remand the case for further proceedings. We affirm the judgment in all other respects.

I. *Sufficiency of the Pre-Termination Process*

   A. *Factual Allegations*

For the last 22 years of Carmody's employment with the University of Illinois, he was manager of systems services in the Department of Industrial and Enterprise Systems Engineering. According to Carmody's complaint and numerous attached exhibits, the university's official reasons for firing him involved a security breach of the university's email system, a breach connected to a state court lawsuit Carmody was then pursuing against a university professor, David Goldberg.

Carmody says that while his lawsuit against Professor Goldberg was pending, he discovered several printed emails in the newspaper box outside his home. The emails contradicted an affidavit that Professor Goldberg's defense attorney had filed in the case, an affidavit by another professor, Deborah Thurston. Carmody gave the emails to his lawyer, who then filed a motion of some kind to which he attached the emails, designating them "Group Exhibit A." Carmody denies knowing how the emails came to be in his newspaper box. (Carmody's claim in his lawsuit against Goldberg was apparently that the professor had assaulted him, though the nature of the claim is irrelevant to Carmody's firing and the case before us. Carmody's suit against Goldberg has since been dismissed.)

The emails Carmody found were between university employees, including Professor Thurston, and all of them

concerned Professor Goldberg. According to Carmody's federal complaint, the state court judge ordered as follows regarding the emails:

> [T]he Court is going to order that Group Exhibit A [the Thurston emails] be placed under seal pending litigation of any further claims of privilege or relevance, and the Court is further going to enter a protective order on the parties that there is to be *no secondary dissemination of any of the contents of Group Exhibit A* as the court has described them, *beyond the respective litigation files of the three lawyers here*.

(Emphasis added.) The three lawyers were Carmody's lawyer, Goldberg's lawyer, and a lawyer for Thurston. Both professors' lawyers were provided by the university.

Carmody then received a pre-termination letter dated July 19, 2010. It explained that he was being investigated for misconduct, that he was suspended with pay immediately, and that if the charges spelled out in the letter were substantiated, they could result in discipline up to and including immediate termination of employment. As far as the substance of the charges went, the letter said:

> It is alleged that you attempted to use the substance of the email messages for non-University related purposes and without permission. Furthermore, there are open questions regarding how you came to be in possession of these documents, specifically whether you obtained them through improper access.

The July 19 letter went on to say that Carmody would have an opportunity to respond to the charges at a meeting later that month.

On July 28th, university officials held a pre-termination meeting with Carmody, who brought his lawyer, Robert Kirchner. At that meeting, Carmody alleges, the university officials said they intended to question him about the contents of the emails in Group Exhibit A. Keeping in mind that we are reviewing a Rule 12(b)(6) dismissal, we must give Carmody the benefit of conflicting information and allegations about what happened in the meeting. We therefore assume that university officials intended to question Carmody about the contents of the emails, as well as how he received them, and that both subjects were important to the pending decision about what action to take against Carmody.

Carmody's lawyer summarized his version of the meeting in an August 3 letter to counsel for the university:

> This letter will summarize the meeting of July 28th, in which you were a participant. [Two university officials] had advised, and you then confirmed that they were in possession of a copy of a document ordered sealed by Judge Leonard and that you, and they, intended to question Kevin Carmody about the contents of, and substance contained in, that document. I advised that I would not permit Mr. Carmody to violate Judge Leonard's order by discussing or disclosing the contents of the sealed materials and that by insisting that he do so, University personnel would be acting in violation of the

order as well. You disagreed and advised that the
"University is not a party to that case." We ad-
journed the meeting with an agreement that I would
send this letter to you, await your reply, and then
seek direction from the Court. I will await your
reply.

The university's counsel wrote in response:

You are correct in that the University has copies of
"Exhibit A," which consist of University documents.
The University is now investigating whether or not
any University policies have been violated and/or
security measures breached in the acquisition or use
of those documents. [University officials] attempted
to ask your client questions about the documents in
his possession, which he declined to answer because
of your interpretation of the Judge's ruling.

I advised that I did not interpret the Judge's ruling
as you did. It is my understanding that the Judge
sealed the documents … because of the concerns
with how the documents were obtained … . I do not
believe it was the intent of the Judge to prevent the
University from using its documents as necessary in
order to determine if there has been a breach of
University security and/or a breach of trust and
responsibility of any University employees … .

I would be happy to join you in a motion for clarifi-
cation of the judge's order if you feel that is neces-
sary. In the meantime, the University will proceed
with its investigation. If your client reconsiders

> participating in this process, please let me know. Otherwise, his refusal to participate may be considered in the investigation.

Attorney Kirchner began efforts to modify the state court order to allow Carmody to respond to the university's accusations and threat of termination. The record does not reflect whether he took the university's lawyer up on her offer to join him in a motion for clarification, though the court modified its order about two months later, on the same day that Carmody was fired.

The investigation was conducted by the university's Academic Human Resources department and was completed in early September 2010. The investigators submitted a report on September 7 to university officials. They recommended that Carmody's employment be terminated. The report explained that, regardless of how Carmody had obtained the emails in Group Exhibit A, "he did not immediately report the breach of security" that must have been perpetrated. Carmody also had "attempted to use the substance of the email messages … for non-University purposes and without permission," and it was "more probable than not that Mr. Carmody obtained the documents in 'Group Exhibit A' through improper access."

On September 9, attorney Kirchner sent a letter to two university lawyers regarding the September 7 report. He contended that the recommendation to fire his client was based in part on a new charge: that Carmody had failed to report a security breach upon receiving the emails. Kirchner asked for an opportunity for Carmody to respond to this new charge. Carmody alleges that no opportunity was provided.

Notice was sent to Carmody on September 23, 2010 that his employment was terminated. The letter also said he could appeal that decision to the associate provost for human resources. According to Carmody's complaint, the state court lifted its restrictions on discussing Group Exhibit A the very day he was fired.

In his complaint in this federal case, Carmody alleges that he was not given sufficient notice and opportunity to respond to the charges against him before he was fired. The district court concluded that Carmody had not stated a due process claim because he had been given an opportunity to respond to the charges at the July 28 meeting but declined to take it. *Carmody v. Board of Trustees of the Univ. of Illinois*, No. 12-CV-2249, 2013 WL 2145878, at *8 (C.D. Ill. May 15, 2013). Moreover, the court explained, Carmody had adequate notice before that meeting of the charge that he failed to report a security breach. Although the charge was not explicitly leveled until after the meeting, Carmody was aware that his possession of the emails was being investigated. According to the court, that was sufficient notice of the later charge of failure to report a security breach. *Id.* at *9.

B.  *Analysis*

A public employee who can be fired only for good cause has a property interest in his or her job and may be deprived of that property interest only with due process of law. See *Gilbert v. Homar*, 520 U.S. 924, 928–29 (1997); *Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532, 538–39 (1985); *Board of Regents of State Colleges v. Roth*, 408 U.S 564, 576–78 (1972); *Harbaugh v. Board of Educ. of City of Chicago*, 716 F.3d 983, 986 (7th Cir. 2013).

For purposes of the motion to dismiss and this appeal, the parties agree that Carmody had a property interest in his job. The university therefore could not deprive him of that property without due process of law.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); see *Baird v. Board of Educ. for Warren Cmty. Unit School Dist. No. 205*, 389 F.3d 685, 690 (7th Cir. 2004); *Schultz v. Baumgart*, 738 F.2d 231, 235 (7th Cir. 1984). The nature and extent of the process a public employee is due before termination depend on the adequacy of any post-termination hearing that was available. *Loudermill*, 470 U.S. at 545–46; *Bodenstab v. County of Cook*, 569 F.3d 651, 663 (7th Cir. 2009). Because we conclude in Part II below that Carmody was given a full opportunity to contest his firing in a post-termination hearing, before he was fired he was entitled under *Loudermill* to only "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546.

Even where there is a robust post-termination procedure, though, a meaningful opportunity to be heard before the employer decides on termination is a critical protection. The purpose of a pre-termination hearing is to provide "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Loudermill*, 470 U.S. at 545–46. Additionally, "[e]ven where the facts are clear, the appropriateness or

necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect." *Id.* at 543; accord, *Hudson v. City of Chicago*, 374 F.3d 554, 560 (7th Cir. 2004); *Duchesne v. Williams*, 849 F.2d 1004, 1008 (6th Cir. 1988) (en banc).

The Supreme Court's view that a post-termination opportunity to try to change an employer's mind will be less meaningful is supported by common sense. It will be harder to convince an employer to reverse a decision to fire someone than to make sure the initial decision is fair and thoughtful. Whether that reluctance to change one's mind is based on concerns about appearing indecisive or admitting a mistake, or on logistical reasons or other factors, the reluctance is real.

The Court's observation is also consistent with what has been shown by decades of behavioral research: once an individual or group has made a decision to take a particular course of action, it becomes harder and harder to change course, even in the face of powerful conflicting evidence and reasons. See generally, *e.g.*, Daniel Kahneman, Thinking Fast and Slow 80–85, 245–54 (2011) (describing confirmation bias, biased assimilation, and sunk-cost effects on decision-making); Geir Kirkebøen, Erik Vasaasen & Karl Halvor Teigen, *Revisions and Regret: The Cost of Changing Your Mind*, 26 J. Behavioral Decision Making 1, 1 (Jan. 2013) (summarizing large body of research that demonstrates "people's reluctance to change their minds"); Craig A. Anderson, *Belief Perseverance*, in Encyclopedia of Social Psychology 109, 109–10 (Roy F. Baumeister & Kathleen D. Vohs eds. 2007), and many sources cited in these

works. That's why a meaningful opportunity to be heard before termination is so important.

Carmody makes two arguments that the university did not comply with the minimal requirements of *Loudermill* before firing him. He first argues that at the July 28 meeting, he did not have a meaningful opportunity to respond to the charges he was aware of because the state court order in the Goldberg case forbade him from discussing the contents of the emails in Group Exhibit A. Second, he argues that the university added the charge that he failed to report a security breach after the July 28 meeting and did not give him an opportunity to respond to this new charge before he was fired, even though he requested such an opportunity.

Both of these are at least plausible theories sufficient to survive the defendants' motion to dismiss. We consider first the effect of the state court order. Attorney Kirchner's letter summarizing the July 28 meeting, which is part of the complaint's allegations, says that Carmody faced questions about the "substance contained in" the emails in Group Exhibit A. The state court judge's order prohibited any secondary dissemination of the contents of those emails beyond the litigation files of the attorneys directly involved in the state court action. We must treat as at least plausible the possibility that Carmody would have violated the state court order if he had answered at least some of the university officials' questions.

If indeed Carmody would have needed to violate the state court order to give his side of the story, he has plausibly alleged that he had no meaningful opportunity before the

termination decision to respond to the most serious charge against him.

Courts have recognized that a public employer may be required to accommodate certain temporary obstacles, such as a serious illness, that prevent an employee from responding to pending charges. See *Calderón-Garnier v. Rodríguez*, 578 F.3d 33, 38 (1st Cir. 2009) ("We do not doubt that at some point a health condition could prevent an individual from meaningfully presenting her side of the story."); *Buckner v. City of Highland Park*, 901 F.2d 491, 495 (6th Cir. 1990) ("Buckner was not suffering from any mental or physical disability which prevented him from offering his response to the complaint."); *Galloway v. Louisiana*, 817 F.2d 1154, 1158 (5th Cir. 1987) (plaintiff who claimed he could not respond to employer's charges pre-termination because he was hospitalized might have been correct, except that he abandoned an opportunity to respond after his release).

That recognition is sound. The general constitutional standard is that an employee with a property interest is entitled to notice of the employer's reasons and a *meaningful* opportunity to respond before the employer decides to terminate the employment. *Domiano v. Village of River Grove*, 904 F.2d 1142, 1148–49 (7th Cir. 1990) (reversing grant of summary judgment to employer because brief pre-termination telephone call did not constitute a meaningful opportunity to respond to charges); see generally *Loudermill*, 470 U.S. at 543; *Mathews*, 424 U.S. at 333. An employee who is silenced temporarily by an illness or injury has no meaningful opportunity to respond. Carmody has alleged here that he was silenced temporarily not by an illness or injury but by a court order,

enforceable with contempt sanctions and other penalties, intended to protect the privacy interests of non-parties.[1]

Adding further support to Carmody's theory are the indications that his lawyer was working with the university's lawyer to modify the state court order so that Carmody could respond freely to the university's allegations. The order was not a permanent or long-term prohibition. It was a temporary obstacle that could be modified, especially with the university's cooperation. Also, the timetable seems both unusual and relevant. The university fired Carmody the same day the state court met with counsel for Carmody and the university and modified its order to allow him to respond to the accusations. There is no indication here of any special urgency that required the university to fire Carmody (remember that he had been suspended with pay) before he could provide a meaningful response to the accusations.

We cannot decide at this point, of course, whether Carmody can present sufficient evidence to survive a motion for summary judgment and to prevail at trial. Perhaps his answering the university's questions would not have required him to violate the state court order. Perhaps he was not reasonably diligent in attempting to remove the obstacle that

---

[1] Carmody's case is substantially different from cases involving employees who decline to respond to an employer's charges because their responses could be incriminating. Such employees, rather than being silenced by a temporary court order, make a voluntary and self-interested choice to stay silent. Cases holding that such employees have been given a sufficient opportunity to respond, see, *e.g.*, *Gniotek v. City of Philadelphia*, 808 F.2d 241, 245 (3d Cir. 1986), do not apply here.

the order presented. Perhaps even a brief further delay would have imposed an undue burden on the university. Such questions cannot be resolved on a motion to dismiss on the basis of the complaint and the attached exhibits. See *Chaney v. Suburban Bus Div. of Regional Transp. Auth.*, 52 F.3d 623, 630 (7th Cir. 1995) (reversing grant of motion to dismiss claim of inadequate pre-termination hearing).

Turning to Carmody's second theory on the pre-termination process, the later-added charge for failure to report a security breach, we also agree with Carmody at the pleadings stage that this charge may have been sufficiently distinct from the original charges that he did not receive fair notice before the July 28 meeting that he faced this charge. Relying on a new charge without providing a meaningful opportunity to respond violates due process. See *Staples v. City of Milwaukee*, 142 F.3d 383, 384, 387 (7th Cir. 1998) (reversing grant of summary judgment for employer because employee was informed of one grievance before a pre-termination meeting but not another and arguably had no meaningful opportunity to respond to new charge); *Peery v. Brakke*, 826 F.2d 740, 743–44 (8th Cir. 1987) (reversing judgment notwithstanding the verdict for employer because employee had notice of only some charges against him and was not "given any opportunity to respond to the new charges before being fired"); see also *Stone v. FDIC*, 179 F.3d 1368, 1376 (Fed. Cir. 1999) ("Procedural due process guarantees are not met if the employee has notice only of certain charges or portions of the evidence and the deciding official considers new and material information.").

The university, relying on *Head v. Chicago School Reform Bd. of Trustees*, 225 F.3d 794 (7th Cir. 2000), contends that Carmody

should have realized a charge of failure to report a security breach was at least implicit in its July 19 letter. In *Head* we affirmed the district court's grant of summary judgment to the employer. We concluded that the rather broadly worded charges leveled against the employee before his pre-termination hearing constituted sufficient notice, particularly because the employee was given an additional opportunity to respond to the charges after the hearing but before he was fired. *Id.* at 799 n.3, 804. This case is different because we face a similar issue on the pleadings rather than summary judgment. We cannot resolve the factual issues on the pleadings, and in any event there is no indication that Carmody received a second pre-termination opportunity to respond to the arguably new charge, as the plaintiff did in *Head*.

The university's response regarding Carmody's pre-termination claim is focused primarily on pointing out, correctly, that Carmody's reliance on *Baird v. Board of Educ. for Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685 (7th Cir. 2004)—a case holding that a breach of contract suit cannot substitute for a post-termination hearing—is misplaced. Regarding the adequacy of Carmody's pre-termination hearing, the university merely states that Carmody could have responded to the charges at the July meeting despite the court order because "[i]t was the use of the e-mails that was being investigated, not the information contained therein." In addition, the university remarks that the "district court correctly ruled that the statement of charges provided to Carmody was certainly sufficient to allow him to defend himself." These conclusory assertions merely contradict Carmody's factual allegations. They are not sufficient to allow

us to affirm dismissal on the pleadings. Carmody should have been allowed to proceed on the theory that he was denied an adequate pre-termination hearing.

II. *Sufficiency of the Post-Termination Hearing*

   A. *Factual Allegations*

After Carmody was fired, he notified the university that he would appeal. He received a document summarizing the hearing procedures, and his attorney Kirchner responded with a letter objecting to a number of perceived deficiencies. The objections relevant to this appeal were that the procedures did not provide for access to examine the university's email system, or for a court reporter or other means of recording the hearing, or for subpoenas to witnesses. The university refused Carmody's requests to alter these aspects of the hearing procedures.

The hearing officer's report, attached as an exhibit to Carmody's complaint, shows that Carmody's lawyer was permitted to cross-examine the university's witnesses extensively. The university rested its case in mid-December 2010, and the hearing was to resume at the end of January 2011 for Carmody to present his evidence.

Scheduling conflicts between attorney Kirchner and counsel for the university delayed resumption, which was rescheduled for May 2011. On April 17, however, Kirchner died. Carmody was left unrepresented. Carmody then asked to see the hearing officer's notes, which he felt would help him find a new attorney. The hearing officer denied that request, but he granted Carmody's request for a few months to replace

Kirchner. Although the university sought a specific deadline, the hearing officer explained that he would not "set firm time limits on Mr. Carmody's efforts to secure new representation."

At the end of June 2011, Carmody sent the hearing officer an email declining to participate in further proceedings. He said the hearing officer should conclude the post-termination hearing with the university's counsel. The hearing was not resumed, and instead the university submitted a written summary of its position.

The hearing officer issued his findings in July 2011. He concluded that the university had *not* shown that Carmody himself breached the computer system to obtain the emails in Group Exhibit A. (The university's evidence showed that the emails were all accessed from Deborah Thurston's computer, and no direct evidence showed that Carmody was the person who accessed them.) But the hearing officer found that the other two charges—Carmody used the emails for non-university purposes without permission and failed to report a security breach—were supported "clearly and convincingly." Based on his findings, the officer recommended that university officials consider whether Carmody would have been fired on those grounds alone, without assuming that Carmody himself had breached the system's privacy. The university informed Carmody the following month that the two "clearly supported" charges were "sufficiently egregious to warrant immediate dismissal." Following the rejection of his post-termination appeal, Carmody filed this federal lawsuit.

In his complaint, Carmody alleges that one or more of the issues attorney Kirchner identified when he objected to the

hearing procedures constituted a denial of due process. He focuses on his inability to record the hearing, to inspect the university's email system, and to subpoena witnesses. He also points to the hearing officer's refusal to supply him with the officer's notes and the officer's refusal to exclude witnesses from the hearing while other witnesses were testifying.

The district court explained that, under *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976), Carmody's right to his employment and the probable value of his desired procedures must be balanced against the cost of the procedures and the university's interest in terminating problem employees. The court concluded in short that Carmody's ability to defend himself was not unduly hindered by the hearing's purported deficiencies, meaning that he had not stated a claim based on a denial of due process. *Carmody*, 2013 WL 2145878 at *10–11.

B. *Analysis*

The requirements of due process are "flexible" and depend on the situation at hand, *Mathews*, 424 U.S. at 334, but at the same time the rules that apply to a given type of situation "are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases," *id.* at 344. The rules are not shaped by "rare exceptions." *Id.*

On appeal Carmody again lists additional procedures he believes should have been provided, but he develops no argument that the potential value of these procedures in post-termination hearings, when weighed against their cost, renders them constitutionally required. He cites a few cases involving post-termination hearings in which a more extensive record was produced, *e.g.*, *Willer v. Las Vegas Valley Water Dist.*, No.

98-15686, 1999 WL 274472, at *2 (9th Cir. Apr. 19, 1999) (post-termination hearing record was over 3700 pages long); *English v. Talladega Cnty. Board of Educ.*, 938 F. Supp. 775, 777 n.2 (N.D. Ala. 1996) (transcript was produced), or unspecified discovery was conducted, *e.g.*, *Powers v. Richards*, 549 F.3d 505, 509 (7th Cir. 2008) (fired employee "had the opportunity to conduct discovery"). Carmody cites no case, however, holding that any of his desired procedures were constitutionally required, and we have found none. The ability to subpoena witnesses, for example, is not always guaranteed in an administrative hearing. See *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 717 (7th Cir. 2000).

In any event, the specific procedures Carmody requested do not require individual analysis. Carmody's decision to bow out of the post-termination hearing—a decision he made freely—forecloses his due process claim to the extent it is premised on that hearing. See *Swank v. Smart*, 999 F.2d 263, 264–65 (7th Cir. 1993) (employee waived right to post-termination hearing by declining it); *Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004) ("[W]here the employee refuses to participate or chooses not to participate in the post-termination proceedings, then the employee has waived his procedural due process claim.").

We are not suggesting that no circumstances could ever justify forgoing a post-termination hearing. (We allowed above for just such a possibility regarding Carmody's pre-termination hearing: a court order prohibiting meaningful participation.) But the complaint and exhibits show that the university offered Carmody an adversarial post-termination hearing before a neutral hearing officer. He was permitted to have legal counsel

and to present evidence and cross-examine witnesses. Carmody participated through the close of the university's case but declined to complete the hearing. His explanation on appeal for bowing out—that he did not want "to participate in his own lynching"—is hyperbole that is completely out of step with his exhibits and allegations. The district court correctly rejected Carmody's due process claim to the extent it was premised on the post-termination hearing.

Carmody also appeals the district court's denial of his motion to amend his complaint, but he has given us no indication what allegations he would like to add. In general, a district court should freely give leave to amend to cure curable defects, at least where there is no undue delay or undue prejudice to the opposing party, but the court can reasonably expect a party asking for an opportunity to amend to identify how he proposes to cure the defects. *E.g.*, *Independent Trust Corp. v. Stewart Information Services Corp.*, 665 F.3d 930, 943–44 (7th Cir. 2012). We see no reason to disturb the district court's decision on this point.

III. *Illinois State Officials and Employees Ethics Act Claim*

Carmody also claims that his firing violated the provision of the Illinois State Officials and Employees Ethics Act that prohibits retaliation against employees who report illegal activity. See 5 Ill. Comp. Stat. 430/15-10. This claim is based on Carmody's belief that his firing actually had nothing to do with the emails he found in his newspaper box. He was fired in 2010, he contends, in retaliation for a report he made three years earlier, in May 2007, about improper activity at the university. According to his complaint, he had learned that two

professors were using a popcorn machine on university property as part of "a private consulting deal" of some sort. He reported this so-called "popcorn activity" to Professor Deborah Thurston (of the later Goldberg case), but she took no action, in Carmody's view because her husband was one of the perpetrators. Carmody's only reason for believing that his report about the popcorn led to his firing seems to be that the popcorn incident occurred and then later he was fired.

If the allegations in a complaint do not "'state a claim to relief that is plausible on its face,'" the claim cannot survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The district court concluded that Carmody did not state a plausible claim under the Ethics Act because the three years separating the popcorn incident and his firing made his claim implausible. *Carmody*, 2013 WL 2145878, at *12–13. We agree with that assessment, at least where Carmody has given us no potential explanation for the long delay between his report and the alleged retaliation. Under these circumstances, three years is "well beyond the time that would allow a reasonable jury to conclude that his termination was causally related" to the report. See *Lalvani v. Cook Cnty., Illinois*, 269 F.3d 785, 790 (7th Cir. 2001) (concluding that a year and a half between employee's action and supposed retaliation made claim implausible). Again Carmody seeks leave to amend his complaint, but nothing in his appellate filings identifies new allegations or suggests that an amendment would make his claim plausible.

For these reasons, we REVERSE the district court's judgment dismissing Carmody's due process claim and REMAND the case for further proceedings limited to whether he was

denied a constitutionally adequate pre-termination hearing. We AFFIRM the dismissal of Carmody's claim under 5 Ill. Comp. Stat. 430/15-10.