In the

# United States Court of Appeals

### For the Seventh Circuit

No. 21-2792

YVONNE MACK,

*Plaintiff-Appellant,*

*v.*

RESURGENT CAPITAL
SERVICES, L.P. and LVNV
FUNDING, LLC,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-16300 — **Sara L. Ellis**, *Judge.*

ARGUED NOVEMBER 9, 2022 — DECIDED JUNE 7, 2023

Before ROVNER, JACKSON-AKIWUMI, and LEE, *Circuit Judges.*

ROVNER, *Circuit Judge.* Yvonne Mack appeals from the dismissal of her claims for lack of standing in this Fair Debt Collection Practices Act ("FDCPA") case. *See* 15 U.S.C. § 1692 *et seq.* The district court concluded that Mack failed to demonstrate that she had suffered an injury in fact sufficient to support her standing to bring suit. But Mack adequately alleged

an injury in fact, and supported her allegations with evidence that the defendants' violation of the statute caused her to suffer monetary damages, albeit of modest size. We therefore reverse and remand for further proceedings.

## I.

Mack had a US Bank credit card that she used to make household purchases. After she allegedly defaulted on that account, defendant LVNV Funding, LLC ("LVNV") purchased the debt. Debts purchased by LVNV are serviced by a related entity, defendant Resurgent Capital Services, L.P. ("Resurgent"). In this instance, Resurgent engaged Frontline Asset Strategies, LLC ("Frontline") to collect on the debt. In a letter dated April 27, 2018, Frontline informed Mack that her account had been placed for collection, and that she owed $7,179.87. The letter provided a website and a phone number that Mack could use to pay the debt. It listed US Bank as the "Original Creditor," and LVNV as the "Current Creditor." The letter also contained, among other things, the following notices to Mack:

> This communication is from a debt collector and is an attempt to collect a debt. Any information obtained will be used for that purpose.
>
> …
>
> Unless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt, or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within 30 days from receiving this notice that you dispute this debt, or any portion thereof, this office will obtain

> verification of the debt or obtain a copy of a
> judgment and mail you a copy of such judgment
> or verification. If you request of this office, in
> writing, within 30 days after receiving this no-
> tice, this office will provide you with the name
> and address of the original creditor, if different
> from the current creditor.

R. 1-3 (hereafter "Frontline Letter").

Although Mack was aware of her debt to US Bank, she was uncertain about the amount claimed in the letter, which seemed high to her, and her obligations to LVNV, an entity with which she was not familiar. Within thirty days of receiving this letter, Mack researched her options using her cell phone, drafted a validation request by hand, traveled to her local library to type and print the letter on the library's computer (she did not have access to a computer or a printer at home), and then went to the post office where she paid $6.70 in postage and $3.45 for a certified mail fee (for a total of $10.15) to send the letter to Frontline. Her letter, postmarked June 5, 2018, was received by Frontline on June 7, 2018. R. 1-4.

Mack did not receive the validation that she requested. Instead, she received a second letter, this one from Resurgent. The letter identified US Bank as the "Original Creditor," LVNV as the "Current Owner," and listed the balance of $7,179.87. The body of the June 18, 2018 letter stated in whole:

> Resurgent Capital Services L.P. manages the
> above referenced account for LVNV Funding
> LLC and has initiated a review of the inquiry we
> recently received.

> For further assistance, please contact one of our Customer Service Representatives toll-free at 1-866-464-1187.
>
> Sincerely,
> Customer Service Department
> Resurgent Capital Services L.P.
>
> **Please read the following important notices as they may affect your rights.**
>
> Unless you notify us within 30 days after receiving this notice that you dispute the validity of this debt, or any portion of it, we will assume this debt is valid. If you notify us in writing within 30 days after receiving this notice that you dispute the validity of this debt, or any portion of it, we will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such judgment or verification. If you request of us in writing, within 30 days after receiving this notice, we will provide you with the name and address of the original creditor, if different from the current creditor.
>
> This is an attempt to collect a debt and any information obtained will be used for that purpose. This communication is from a debt collector.

R. 1-5 (hereafter "Resurgent Letter"). The bottom of the Resurgent Letter listed hours of operation, an address, phone and fax numbers, and a "Customer Portal" website address.

Mack was confused and alarmed by the Resurgent Letter. She had already requested validation within 30 days of

receiving the Frontline Letter and had not received the requested validation. More than 30 days had passed since receiving the Frontline Letter and she was now being told that she would have to request validation again from a different company or the creditor would assume the debt was valid. She was even more confused regarding who owned the debt, now believing that Resurgent might own it. She concluded that she needed to send a second validation request, this time to Resurgent, so that the creditor would not assume that the debt was valid. She once again took the steps necessary to write up her draft letter by hand. She returned to the library to type it into the library computer (because library users cannot save previous documents on the library's computer), printed it, and returned to the post office where she once again paid for postage and a certified letter fee (this time totaling $3.95) to send her July 17, 2018 validation request.[1]

None of this was easy for Mack. She had been unemployed for some time and spent her days caring for family members with serious health problems. Trips to the library and post office meant that she was away from the family members who needed her assistance. The $3.95 postage fee for the second letter was also problematic for Mack. Mack explained the harm caused by the letter from Resurgent:

---

[1] To send the first letter, Mack appears to have used Priority Mail ($6.70) plus Certified Mail ($3.45) for the total of $10.15 that is reflected on the receipt for that letter. The envelope for the second letter shows a cost of $3.95, which we may assume included regular First Class postage of fifty cents plus the Certified Mail fee of $3.45. See https://about.usps.com/news/national-releases/2017/pr17_062.htm (last visited June 7, 2023), *archived at* https://perma.cc/J9KV-AP4D. The defendants do not dispute that Mack paid $3.95 in postage to send the second validation request.

It was unclear—first of all, I didn't get a response from the first letter. I asked for validation. I got nothing. Shortly after that I got a second letter from a sister company as it appears to be under the same umbrella here requesting the same thing and waited and got no response.

So the confusing part was can they do this? Can they ask me for—can they tell me that I owe a debt to them and not verify the information that I'm requesting and then just pass it on, which they never verified any proof of—other than sending this initial letter to me—is that—I was trying to see is that legal, something they can do, and is that going to continue on because it's time, money, frustration, you know, going to the library, typing, printing and, you know, just wanted to know what were they doing, is that legal, because I'm steady dishing out money that I don't have and they're not even responding back to me, you know, things that I'm asking for to validate it, just saying that, oh, you owe me this money.

R. 65-2, at 115–16. When asked what she meant by "dishing out money," Mack responded:

Well, I mean spending money. I have to pay for the postage. Mind you, I'm not working or anything. So this is time, money to go to the library, have it typed up[.]

R. 65-2, at 116.[2] *See also* R. 65-2, at 117 (where Mack explained, "[T]he money was—it doesn't seem like much, but when you don't have it, even this adds up, you know."). Mack explained that this was all new to her and that she was trying to take the proper steps to validate the debt so that she would not "get duped" into sending money to someone who had no proof of the amount or ownership of the debt. She explained that anyone could claim that someone owed them a debt and that without validation, there was no proof that LVNV or Resurgent owned the debt. In addition to the monetary cost, Mack also cited other harms from the Resurgent Letter including the expenditure of her time in responding to the second validation request and her added stress, frustration and confusion brought about by the Resurgent Letter.

Mack never received validation of the debt from Frontline, Resurgent or LVNV. Approximately three months after sending her second request for validation, Mack filed a class action suit against Resurgent and LVNV, claiming violations of the Fair Debt Collection Practices Act ("FDCPA"). R. 1 (Complaint). In particular, Mack asserted in her Complaint that the Resurgent Letter "would cause any consumer, let alone the unsophisticated consumer, to believe that she must yet again dispute the Debt despite the fact that such consumer had already submitted a valid dispute of the Debt." R. 1, at 6. She alleged that the Resurgent Letter violated the FDCPA in a number of ways, including that it used false, deceptive,

---

[2]     Mack did not testify about the cost of getting to the library, which she testified was approximately five minutes from her home. Nor did she discuss the cost of printing at the library. Without any evidence regarding the costs of travel or printing, we will limit our analysis to the $3.95 that Mack expended on postage for her second validation request.

misleading and unfair or unconscionable means to collect or to attempt to collect a debt in violation of sections 1692e, 1692e(10), and 1692f; it failed to adequately state the name of the creditor to whom the debt was owed in violation of section 1692g(a)(2); and it was otherwise deceptive and failed to comply with the FDCPA. Mack again asserted that these material violations of the FDCPA "would lead a consumer to believe that their dispute had not been effective and that they had to re-dispute the debt, or that they did not have the rights that Congress gave them under the FDCPA. In fact, Defendants' letter confused and alarmed Plaintiff." R. 1, at 6. She also pled allegations in support of a class action. She attached to her complaint a copy of the Frontline Letter as well as the receipt for the postage and certified mail fees.

The defendants ultimately moved to dismiss under Rule 12(b)(1) for lack of standing. The defendants asserted that Mack failed to allege an injury in fact from the Resurgent Letter, claiming only that the Letter confused and alarmed her. They faulted Mack for not pleading that the confusion caused her to take any action to her detriment on account of her confusion. Mack countered that she did in fact plead and demonstrate that the Resurgent Letter caused her to act to her detriment: it caused her to spend both time and money sending a second request for validation in order to preserve her rights. The district court ultimately agreed with the defendants that Mack had failed to establish standing. The district court found that the time and money spent to send the second validation request did not rise to the level of detriment required for standing in FDCPA cases because the Resurgent Letter "did not adversely affect any interests Congress sought to protect through the FDCPA and instead effectively provided Mack with another opportunity to dispute her debt if she had failed

to properly do so upon receipt of the first letter." *Mack v. Resurgent Capital Servs., L.P.*, 2021 WL 3901747, *3 (N.D. Ill. Sept. 1, 2021). Mack could have established standing, the court explained, if she had "taken some action related to her debt management choices," such as paying something she did not owe, or paying a debt with low interest when the money could have been used to pay a debt with high interest. *Id*. The court characterized Mack's second validation request as an "attempt to clear up her confusion," and compared this to injuries arising from consulting a lawyer or filing suit, which the court said were insufficient to establish standing. *Id*. Mack appeals.

## II.

Before we begin with our analysis of Mack's appeal, we must address a preliminary matter: in its opinion, the district court acknowledged that the defendants moved under Rule 12(b)(1) to dismiss for lack of standing. The court then remarked that, because the parties had engaged in discovery, it would treat the motion as one for summary judgment under Rule 56. That was error. Although a district court may transform a motion for dismissal under Rule 12(b)(6) into one for summary judgment when "matters outside the pleadings are presented to and not excluded by the court," Fed.R.Civ.P. 12(d), "the Federal Rules of Civil Procedure contain no analogous recognition that a 12(b)(1) motion can evolve into dismissal pursuant to Rule 56." *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993). A grant of summary judgment is a decision on the merits, but "a court must dismiss the case without ever reaching the merits if it concludes that it has no jurisdiction." *Id.* If the plaintiff lacks Article III standing to sue, the court has no jurisdiction to hear the matter. *Spokeo,*

*Inc. v. Robins*, 578 U.S. 330, 337–38 (2016) (noting that Article III limits the power of the judiciary to addressing cases and controversies, and "[s]tanding to sue is a doctrine rooted in the traditional understanding of a case or controversy."). "In short, the question of jurisdiction is inappropriate for summary judgment, and discussing the interplay of Rule 12(b)(1) and Rule 56 verges on non sequitur." *Capitol Leasing*, 999 F.2d at 191. Nevertheless, "[w]hen subject-matter jurisdiction— which is to say, the power to hear and decide the case at all— is at stake, a district judge may resolve factual disputes and make any findings necessary to determine the court's adjudicatory competence." *Craftwood II, Inc. v. Generac Power Sys. Inc.*, 920 F.3d 479, 481 (7th Cir. 2019). Although the court purported early in its decision to treat the motion as one for summary judgment, the court ultimately dismissed the case without prejudice due to lack of standing, and vacated its order certifying a class. If Mack lacked standing, that would have been the proper disposition, and we will therefore simply review the case as an appeal from a dismissal under Rule 12(b)(1).

On appeal, Mack asserts that the district court erred when it found that the time, effort and out-of-pocket costs expended in sending a second validation request were not adequate to establish standing. We review *de novo* the district court's dismissal for lack of Article III standing. *Flynn v. FCA US LLC*, 39 F.4th 946, 952 (7th Cir. 2022). Standing consists of three elements: a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Flynn*, 39 F.4th at 952 (quoting *Spokeo*, 578 U.S. at 338). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected

interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "By particularized, we mean that the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. The Supreme Court has described a "concrete" injury as an injury in fact, one that is real and not abstract, although it need not necessarily be tangible. *Spokeo*, 578 U.S. at 1548–49. In determining if an injury is concrete, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S. at 341. "Tangible harms, like physical or monetary harms, 'readily qualify as concrete injuries.'" *Persinger v. Southwest Credit Sys., L.P.*, 20 F.4th 1184, 1190 (7th Cir. 2021) (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021)). A bare procedural violation, divorced from any concrete harm, would not satisfy the injury-in-fact requirement for Article III standing. *Spokeo*, 578 U.S at 341. Instead, a plaintiff "must show that the violation harmed or 'presented an "appreciable risk of harm" to the underlying concrete interest that Congress sought to protect.'" *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (quoting *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 887 (7th Cir. 2017)). "If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion*, 141 S. Ct. at 2204.

Congress passed the FDCPA to curb "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). Such practices "contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." *Id*. In

order to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses," Congress placed certain obligations on debt collectors and granted rights to consumers. 15 U.S.C § 1692(e). As is relevant here:

> Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—
>
> (1) the amount of the debt;
>
> (2) the name of the creditor to whom the debt is owed;
>
> (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;
>
> (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or

judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

15 U.S.C. § 1692g(a). The statute also provides a clear directive to debt collectors who receive a written dispute from a consumer:

If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. Any collection activities and communication

during the 30-day period may not overshadow
or be inconsistent with the disclosure of the con-
sumer's right to dispute the debt or request the
name and address of the original creditor.

15 U.S.C. § 1692g(b).

Mack argues that Resurgent's letter confused her and
caused her to question whether her first attempt to seek vali-
dation of the debt had been deficient in some way. Because it
came from a different party, she was even more uncertain
about who owned the debt. As she pled in her complaint, the
Resurgent Letter "would cause any consumer, let alone the
unsophisticated consumer, to believe that she must yet again
dispute the Debt despite the fact that such consumer had al-
ready submitted a valid dispute of the Debt." R. 1, at 6. Citing
the various ways that the letter violated the FDCPA, Mack
again asserted that the defendants' violations of the FDCPA
"would lead a consumer to believe that their dispute had not
been effective and that they had to re-dispute the debt, or that
they did not have the rights that Congress gave them under
the FDCPA. In fact, Defendants' letter confused and alarmed
Plaintiff." R. 1, at 6. The defendants contend that Mack pled
nothing more than confusion, that confusion alone is insuffi-
cient to establish a concrete harm, and so she lacks standing.

The defendants' argument ignores the standards under
which we assess the allegations in a complaint when consid-
ering a motion to dismiss. A complaint does "not need de-
tailed factual allegations," but "[f]actual allegations must be
enough to raise a right to relief above the speculative level[.]"
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A com-
plaint may meet this standard by pleading enough factual
matter (taken as true) "to raise a reasonable expectation that

discovery will reveal evidence of" a necessary element of the claim. *Bell Atlantic*, 550 U.S. at 556. *See also Bazile v. Finance Sys. of Green Bay, Inc.*, 983 F.3d 274, 280 (7th Cir. 2020). Where a complaint does not detail an injury, if the "allegations support a plausible inference that [the plaintiff] suffered a concrete detriment to her debt-management choices," the details regarding how the plaintiff would have acted differently would have to be resolved later. *Bazile*, 983 F.3d at 281. *See also Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 285 (7th Cir. 2020) (initially, "a plaintiff may demonstrate standing by clearly pleading allegations that 'plausibly suggest' each element of standing when all reasonable inferences are drawn in the plaintiff's favor"). Where the debt collector challenges the truth of the underlying jurisdictional allegations, "the action may not proceed without additional inquiry into whether she actually suffered such a harm." *Bazile*, 983 F.3d at 281. At that point, "the plaintiff must supply proof, by a preponderance of the evidence or to a reasonable probability, that standing exists." *Spuhler*, 983 F.3d at 285. Moreover, "if a complaint 'omitted essential jurisdictional allegations,' but evidence later demonstrates that the court has jurisdiction, 'the deficiency in the complaint is not fatal.'" *Spuhler*, 983 F.3d at 285 (quoting *Casio, Inc. v. S.M. & R. Co.*, 755 F.2d 528, 530 (7th Cir. 1985).

In this instance, Mack pled that the Resurgent Letter would confuse any debtor, leading her to believe that her initial dispute of the debt was not valid, and causing her to believe that she must re-dispute the debt or lose the rights that the FDCPA grants to debtors. She also alleged that she was, in fact, confused in that manner. The debt, as we have noted, must be disputed in writing. Mack attached to her complaint the receipt detailing what she paid to mail the first letter.

*Freeman v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 927 F.3d 961, 963 (7th Cir. 2019) (when reviewing a grant of a motion to dismiss, we assume the truth of the allegations in the complaint and its attachments); *Carmody v. Board of Trs. of Univ. of Ill.*, 747 F.3d 470, 471 (7th Cir. 2014) (when reviewing a grant of a motion to dismiss, we take the facts alleged in the complaint as true and also consider attached exhibits). Applying the *Bell Atlantic* standard, it is reasonable to infer that Mack re-disputed the debt, and in doing so suffered a concrete injury at least in the form of postage paid to send the second validation request. Mack's deposition testimony "illuminated these allegations." *Persinger*, 20 F.4th at 1190. She clarified that she went through the same process to mail the second letter as she did for the first, spending time, effort, and money for postage and certified mail fees. R. 65-2, at 116–17. The Resurgent Letter thus caused her to suffer a concrete detriment to her debt-management choices in the form of the expenditure of additional money to preserve rights that she had already preserved.

Congress clearly anticipated that preserving the right to validation would have some cost to the consumer: the provision requires that the consumer notify the debt collector of the request for validation "in writing." The initial $10.35 that Mack spent sending the first validation request was an expected cost of the consumer preserving her rights. But with the second postage fee of $3.95, Mack has pled harm to an underlying concrete interest that Congress sought to protect. *Casillas*, 926 F.3d at 333. Namely, Congress sought to protect debtors from abusive debt collection practices that contributed to personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy. Money damages caused by misleading communications from the

debt collector are certainly included in the sphere of interests that Congress sought to protect. *TransUnion*, 141 S. Ct. at 2204. Indeed, when we asked counsel at oral argument whether there was any limit to how many times a debt collector could mislead a debtor into reasserting rights and spending additional money to do so, counsel's answer, essentially, was that her client had done so only once. See Oral Argument at 18:15–19:00 ("This was one letter though. This wasn't multiple attempts."). An argument that the defendant harmed the plaintiff only once is not an argument that the plaintiff was not harmed. There is no discernable limit to the number of times a debt collector could mislead a debtor to her detriment with impunity under that argument.

Although money damages are almost always found to be concrete harm, *Persinger*, 20 F.4th at 1190, the defendants contend that we must look to the reason that Mack spent the money. They argue that because she spent the money in order to clear up her confusion, the cost is inadequate to establish standing. It is true that we have held that "the state of confusion is not itself an injury." *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1068 (7th Cir. 2020). But the defendants' argument mischaracterizes Mack's claim and her evidence. "A debtor confused by a dunning letter may be injured if she acts, to her detriment, on that confusion—if, for example, the confusion leads her to pay something she does not owe, or to pay a debt with interest running at a low rate when the money could have been used to pay a debt with interest running at a higher rate." *Brunett*, 982 F.3d at 1068. The examples offered in *Brunett* are not an exclusive list of the ways in which a plaintiff's confusion might cause her to act to her detriment. Mack spent extra money not to clear up her confusion but in order to preserve her right to seek validation, which she had

been misled to believe she failed to do the first time. This distinguishes Mack's situation from cases where plaintiffs caused themselves injury or were literally trying to clear up their own confusion, for example, by seeking advice from a lawyer.

The defendants also assert that sending the second letter did not harm Mack in any way because it helped her preserve her rights. But Mack had *already* preserved her rights, and it was only because of the misleading Resurgent Letter that Mack went to the trouble and expense of asserting her rights a second time. This did not benefit Mack in any way as her testimony reveals. Fixing the problem that the Resurgent Letter created caused Mack to again leave her home where she was caring for ill relatives, travel to the library, type and print the letter, go to the post office and again pay to mail the letter to the defendants. That the dollar cost was modest is irrelevant; she was misled to her financial detriment. *Craftwood II*, 920 F.3d at 481 (even when an injury is slight, an "identifiable trifle" suffices to establish standing).

Mack meets the remaining prongs of the standing test as well. The injury was particular to her. *Lujan*, 504 U.S. at 560 n.1. That is, the money she spent fixing the problem created by the Resurgent Letter came out of her own pocket. The time and effort she spent reasserting her rights were specific to her. These injuries affected Mack "in a personal and individual way." *Id*. Thus, Mack has adequately demonstrated an injury in fact.

That injury is also fairly traceable to the challenged conduct of the defendants. *Spokeo*, 578 U.S. at 338; *Flynn*, 39 F.4th at 952. Mack pled that, instead of sending the statutorily required validation, the debt collector sent a misleading

communication that violated the statute and caused her to believe that she had not yet adequately preserved her right to validation. The Resurgent Letter led her unnecessarily to expend *additional* time, money and effort *reasserting* her right. Mack would not have gone to the trouble and expense of sending a second request for validation if she had not been misled by the Resurgent Letter.

Finally, Mack's injury is likely to be redressed by a favorable judicial decision. *Spokeo*, 578 U.S. at 338. In addition to her modest money damages, the FDCPA provides for statutory damages up to $1000. The defendants protest that Mack has disclaimed actual damages and they contend that this means her injuries are not redressable by a favorable result. They cite the complaint and a portion of Mack's deposition as evidence that Mack does not seek recovery for the time and money she spent sending the second validation request. That is not a fair reading of the complaint, though, which requests statutory damages, costs, reasonable attorney's fees and "any other relief deemed appropriate," a phrase which easily encompasses actual damages. As for the deposition, defendants' counsel sought Mack's admission that the complaint did not use the words "actual damages" and instead sought only statutory damages. When it became clear that Mack, a layperson, did not know the legal difference between actual and statutory damages, Mack's counsel interjected and conceded that the complaint did not expressly ask for actual damages. Construing the evidence in Mack's favor for the purposes of the motion to dismiss, this was not a concession that Mack was not seeking actual damages but only a concession that the complaint did not use that express term. Because the complaint included the catch-all "any other relief" clause and because Mack made clear at her deposition that the cost of

postage was an actual loss to her, this argument falls flat. Even if Mack disclaimed compensatory damages for the postage, statutory damages would more than compensate her for her modest out-of-pocket costs and satisfy the redressability prong of the standing test. "The FDCPA does not require proof of actual damages as a precursor to the recovery of statutory damages." *Keele v. Wexler*, 149 F.3d 589, 593-94 (7th Cir. 1998). Thus Mack's injuries are likely to be redressed by a favorable judicial decision. *Cf. Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 800–02 (2021) (holding that a request for nominal damages satisfies the redressability element of standing where the plaintiff's claim is based on a completed violation of a legal right, and noting that a party whose rights have been invaded can always recover nominal damages without furnishing any evidence of actual damage).

We decline to address Mack's additional argument that standing is supported by a theory that the Resurgent Letter intruded upon her seclusion or invaded her privacy, or that it resembled common-law fraud. Finally, when the district court dismissed the case, it also vacated its order certifying the class. Mack notes that, on remand, it will be necessary to re-define the previously certified class to include only those persons who submitted a second dispute. We agree that the class definition should be modified to limit the class to persons who acted to their detriment upon receiving the second letter.

REVERSED AND REMANDED.