In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 22-1848

ANGELIQUE SNOWDEN,

*Plaintiff-Appellant,*

*v.*

ILLINOIS DEPARTMENT OF HUMAN SERVICES
and RONALD KORZA,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:18-cv-03017-SEM-TSH — **Sue E. Myerscough**, *Judge.*

———————————

ARGUED MAY 19, 2023 — DECIDED AUGUST 2, 2023

———————————

Before FLAUM, ROVNER, and ST. EVE, *Circuit Judges.*

ROVNER, *Circuit Judge.* Plaintiff-appellant Angelique Snowden challenges her discharge from the Illinois Department of Human Services (the "Department"). As relevant to this appeal, Snowden contends that defendant-appellee Ronald Korza, her bureau chief, violated her due process rights by making the decision to discharge her before she was granted a hearing on the charges culminating in her discharge

and before she was given the opportunity to respond to those charges. Because Korza was not the decisionmaker as to her discharge, and because Snowden was given both notice and the opportunity to respond to the charges before that decision was made—as well as a post-discharge grievance process—we conclude that Korza did not deprive her of due process.

**I.**

At the time of her discharge in 2017, Snowden was working as a disability claims adjudicator in IDHS's Bureau of Disability Determination Services (the "Bureau"). The Bureau bore responsibility for reviewing disability claims filed by Illinois residents with the federal Social Security Administration ("SSA"). Snowden was a union member and as such enjoyed the protections of a collective bargaining agreement between her union and IDHS, including a grievance process.

As a claims adjudicator, Snowden was responsible for making initial disability determinations, reconsideration determinations, and continuing disability reviews. The latter reviews required her to determine every three years whether a recipient receiving SSA disability benefits continued to be disabled. Those determinations often required the adjudicator to contact the claimant and his or her medical providers by telephone and when appropriate direct the claimant to undergo a consultative examination with an IDHS-approved physician. Pursuant to SSA regulations, all attempts to contact a claimant must be documented, so it was the adjudicator's responsibility to make a record of all such phone calls. A claimant's failure to cooperate with the adjudicator could result in a determination that the claimant's benefits should be terminated.

Korza was the bureau chief in 2017. In late March or early April 2017, Korza was approached by section chief Frank Gardner, Snowden's immediate supervisor, about a complaint Gardner had received in January regarding Snowden's handling of a claim. Gardner had been contacted by an SSA disability recipient who was notified that her benefits were being terminated because she purportedly had refused to attend a consultative examination to confirm her ongoing disability. The recipient advised Gardner that she had not refused to attend such an examination but rather had told Snowden that she did not want to see the same doctor she had seen previously because he had caused her pain during the prior examination. She had only spoken with Snowden once and had not been offered another physician to see. Gardner advised the recipient that she could see a physician at a different clinic and that he would see about getting her benefits reinstated. When Gardner subsequently reviewed the billing records for Snowden's office telephone line, he saw that there was only one call placed to the claimant from that line rather than the three recorded in Snowden's narrative entries. R. 20-9 at 2.

Korza then looked at some of the record narratives in some of Snowden's other cases and compared them with telephone records to see whether the phone records were consistent with the call notations in Snowden's files. In the five cases Korza looked at (which included that of the claimant who had spoken with Gardner in January), he found discrepancies in each of them, in that the phone records did not reflect some or all of the calls that Snowden claimed to have made in her notations.

On May 4, 2017, Korza and Julie Potter, a division administrator who was typically involved with investigations, met

with Snowden and her union representative for a prelimi-nary, investigatory interview. Korza advised Snowden that she was under investigation for making false entries in the narrative portions of her case records and that she might be subject to disciplinary action. She was presented with the nar-rative entries for the five cases which reflected phone calls by Snowden that the agency's phone records did not confirm. In the course of the interview, Snowden confirmed that she used only her office line to make the phone calls, and she suggested that there might be a problem with her office phone—she in-dicated there was a prior situation in which other people in the office were receiving her calls. Snowden was also asked about the disability recipient whose complaint had started the investigation, and Snowden among other things represented that she had given the recipient the name of another physician in Stelleville (presumably where the recipient lived or re-ceived care) that the recipient could see for her consultative examination. But Potter advised Snowden that there was only one vendor physician the recipient could see in Stelleville—the one the recipient had seen previously and did not want to see again.

After the May 4 interview, Korza continued his review of Snowden's cases and found a total of 63 phone calls in 29 dif-ferent case files that Snowden had noted but which could not be verified. Of those 29 files, 22 were continuing disability re-view cases in which the claimants had had their benefits ter-minated based on a failure to cooperate. In the majority of those cases, the determination that there had been a failure to cooperate was based on falsely documented phone calls. R. 20-11 at 2.

In the course of his investigation, Korza consulted with Steve Clark in the Department's Labor Relations office. Korza wanted to confirm that the Labor Relations office regarded discharge as an appropriate penalty for the fabrication of agency case records. Korza explained that he lacked the authority to discharge anyone—that was a decision that belonged in the first instance to the Labor Relations office—and he was not going to propose a penalty that Labor Relations would not support. Clark advised Korza that discharge indeed was an appropriate penalty for the falsification of records.

On June 21, 2017, Korza wrote a memorandum to Quinetta Wade, his supervisor and the director of the Division of Rehabilitation Services, summarizing his findings. He recommended that Snowden be discharged. R. 20-11.

On July 18, Korza notified Snowden that a pre-disciplinary meeting would take place on the following day and that the Department was considering imposing discipline for falsified entries in her case files. Snowden and her union representative met with Korza and Potter as scheduled on July 19. Snowden was provided with a written statement of charges, which included conduct unbecoming of a state employee and falsification of records. R. 24-1 at 9–10. When her union representative inquired what discipline was being contemplated, Korza replied that the discipline was undetermined at time, given that Snowden had not yet had an opportunity to respond to the charges, but that the charged violations were subject to discipline up to and including discharge. (Unbeknownst to Snowden, however, Korza had in fact already recommended that she be discharged in his June memorandum

to Quinetta Wade.) Snowden was advised that she had five days to provide a written rebuttal to the charges.

Snowden's union representative subsequently sent a written rebuttal to Korza which, apart from summarily denying that Snowden had willfully falsified records or intended to bring discredit upon her supervisor or the agency, did not contest the factual basis for the charges against Snowden. The rebuttal argued that Snowden was a 10-year employee with good performance evaluations, that she had an otherwise spotless disciplinary history, that no discrepancies in her work had been reported prior to this investigation, that if Snowden "made mistakes as anyone has, she can admit to that," but that Korza was "blowing this matter out of proportion." R. 20-6 at 4. The rebuttal also cited a number of arguable shortcomings in the investigation, including:

> (1) The SSA claimant complaint that triggered the investigation had been received in January 2017, some four months before the initial investigatory interview took place on May 4, making it more challenging for Snowden to respond to questions about how she handled that claim.

> (2) Although Korza had drafted a written summary of the May 4 investigatory interview, he had not asked or permitted Snowden or her union representative to review that summary at the time it was prepared. Snowden's subsequent review of the summary revealed that it was missing some issues that were raised in the interview, including questions that were posed by Snowden and her representative.

(3) Not all incoming and outgoing phone calls at the Department were documented, as Potter and Korza had acknowledged at the May 4 interview.

(4) There was no follow-up by Korza or Potter regarding Snowden's report that she had previously had difficulties with her office phone and had replaced the phone and its cord in an effort to resolve those difficulties.

(5) It was "unusual" that no one from Snowden's chain of command was involved in the investigation.

(6) Although Korza had provided Snowden with multiple documents, the union representative did not believe that all relevant documentation had been produced.

(7) No signed witness statements from any disability claimants alleging wrongdoing by Snowden had been provided.

R. 20-6 at 2–3. Korza forwarded this rebuttal to Clark in the Department's Labor Relations office along with the observation that it did not change his view that Snowden should be discharged, given that it provided no explanation for the underlying conduct.

As noted above, Korza testified that he did not have the authority to discharge anyone. Rather, the discharge decision was made by the Department's Labor Relations office, in consultation with the Illinois Department of Central Management Services ("CMS"), which has the authority to terminate

a state employee.[1] That is why Korza had consulted with Clark in the Labor Relations office before recommending to Wade that Snowden be discharged.

On August 8, 2017, Korza convened a final meeting with Snowden and advised her that she was being placed on suspension pending discharge. On August 31, 2017, CMS Director Michael Hoffman signed a personnel action form terminating Snowden for cause effective September 6, 2017. R. 20-1. Hoffman also initialed the statement of charges confirming that she would be discharged. R. 20-2. James Dimas, the Secretary of the Department of Human Services, also signed the personnel action form. R. 20-1.

Snowden subsequently exercised her right under her union's collective bargaining agreement to pursue a grievance challenging her discharge. That process proceeded through the third step of the contractual grievance procedure, which resulted in an agreement that Snowden would be given the opportunity to resign without reinstatement rights, provided that she agree not to seek further employment with the Department. R. 20-3. Her representative advised her at that juncture that the union did not want to pursue the grievance to arbitration, which was the next and final step in the grievance resolution process. Despite the agreement to let her resign in

---

[1] Illinois law makes clear that it is the director of CMS who must authorize the discharge of a state employee like Snowden. *See* Ill. Admin. Code tit. 80 § 302.720 ("No discharge of a certified employee shall be effective without the approval of the written charges for discharge by the Director."); 20 ILCS 415/9(5) (the CMS director must "approve all written charges seeking discharge … after consultation with the operating unit").

lieu of discharge for cause, Snowden did not submit her resignation and was therefore discharged.

Snowden subsequently filed this suit against the Department and Korza, asserting two claims: (1) when she applied for a new position with the Department in 2016, the Department had rejected her for that position because she was at that time on parental leave following the birth of her child, thereby retaliating against her for exercising her leave rights, in violation of the Family and Medical Leave Act ("FMLA"); (2) Korza had violated her Fourteenth Amendment right to procedural due process by not giving her a meaningful opportunity to be heard before she was discharged, in that he had already made up his mind to discharge her *before* the July 19th pre-disciplinary meeting (as reflected in his June memorandum to Quinetta Wade), and therefore was not the impartial decisionmaker/adjudicator that due process requires. R. 1.

At summary judgment, Snowden conceded that she could not meet her burden as to the FMLA retaliation claim against the Department, and the court therefore entered summary judgment against her on that claim. *Snowden v. Ill. Dep't of Human Servs.*, 2022 WL 902594, at *2 (C.D. Ill. Mar. 28, 2022). As to the procedural due process claim, the court observed that Snowden had been given both notice and the opportunity to be heard on the charges resulting in her discharge. She had been notified of both the investigation and the charges at the May and July meetings, and she had been given the opportunity to rebut the charges following the July pre-disciplinary meeting. *Id.* at *3. And although Snowden alleged that Korza was a biased decisionmaker in that he had already made up his mind that she should be discharged prior to the July predisciplinary meeting and before she submitted her rebuttal to

the charges, Snowden conceded that Korza himself did not have the authority to make the final decision as to her discharge; that decision instead was made by the Department's Labor Relations office in consultation with CMS. *Id.* "That the ultimate decisionmaker did not agree with [Snowden] and instead affirmed Mr. Korza's recommendation does not result in a deprivation of due process." *Id.* The court therefore granted summary judgment against Snowden and in favor of Korza on the due process claim.

## II.

As this case was resolved on summary judgment, we review the district court's judgment *de novo* and grant Snowden the benefit of a favorable review of the record evidence. *E.g., Bounds v. Country Club Hills Sch. Dist. 160*, 64 F.4th 926, 929 (7th Cir. 2023) (citing *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 964 (7th Cir. 2020)).

Pursuant to 20 ILCS 415/11, Snowden could not be discharged except for cause, and the parties consequently agree that Snowden had a property interest in her job and that she could be deprived of her position only with due process of law. *See Carmody v. Bd. of Trustees of Univ. of Ill.*, 747 F.3d 470, 474 (7th Cir. 2014) (collecting cases). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* (cleaned up). As the Supreme Court's decision in *Cleveland Bd. of Educ. v. Loudermill* makes clear, in the context of employee discharge, the requisite pre-deprivation hearing "need not be elaborate." 470 U.S. 532, 545, 105 S. Ct. 1487, 1495 (1985). Where a post-discharge process is available to the employee to challenge her termination, the purpose of a pre-termination hearing is not to definitively resolve whether discharge is

appropriate, but rather to serve as "an initial check against mistaken decisions–essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46, 105 S. Ct. at 1495; *see also Carmody*, 747 F.3d at 475. The essential components of the hearing are notice of the grounds for the proposed discharge and the opportunity to respond to those grounds. *Loudermill*, 470 U.S. at 546, 105 S. Ct. at 1495. The form of both the notice and the response can be either oral or written. *Ibid.*; *Blackout Sealcoating, Inc. v. Peterson*, 733 F.3d 688, 691 (7th Cir. 2013).

There is no dispute that Snowden was given both: First, she was placed on notice of what Korza was investigating in May 2017, when Korza and Potter met with her (and her union representative), discussed the complaint that had triggered the investigation, and also discussed the discrepancies in the four additional case files that Korza's preliminary review had unearthed. Subsequently, in July 2017, at the pre-disciplinary meeting, she was presented with a written statement of the charges and advised that although no decision had yet been made as to what action would be taken against her, she was potentially subject to discipline up to and including discharge. She was then given five days to submit a written rebuttal to the charges, which her union representative in fact submitted. Although that rebuttal did criticize the charges and the process in certain respects and denied that Snowden had acted with a culpable intent, it did not take issue with the factual basis for the charges—i.e., that Snowden had made false entries into multiple case files.

Snowden does not quarrel with the particular format that the Department chose to give her notice of the charges and the

opportunity to respond to them, i.e., two in-person meetings where she was advised of the nature of the investigation and the resulting charges, coupled with the opportunity to rebut the charges in writing following the July 19 pre-disciplinary meeting. There was no formal hearing at which witnesses gave evidence, for example, but *Loudermill* leaves no doubt that the notice-and-response process need not be elaborate or take a particular form, so long as the process is sufficient to make the employee aware of the charges she is facing and affords her an adequate opportunity to respond to the charges before action is taken against her.

Snowden nonetheless argues that she was deprived of due process in the sense that Korza, whom she alleges was the true decisionmaker as to her discharge, had already made up his mind that she should be fired before the July disciplinary meeting took place and before she had the chance to present her rebuttal to the charges. And it is true that Korza had already proposed that Snowden be discharged: he made that recommendation in the written summary of his findings that he submitted to Quinetta Wade in June 2017, the month prior to the pre-disciplinary meeting where Snowden was presented with the charges. In view of that recommendation, Snowden contends that the July 19 pre-disciplinary meeting to discuss the charges against her and the follow-up opportunity she was given to submit a written rebuttal to those charges were a sham.

But as the district court pointed out, Snowden concedes that Korza, in fact, lacked the authority to make the discharge decision. That belonged to the Labor Relations office of the Department and to CMS. So to the extent Korza had already pre-judged the matter when the pre-disciplinary meeting

took place in July and when Snowden submitted her rebuttal, his role was only to make a recommendation, not to decide whether she would or would not be discharged. There is no evidence that the individuals who made that decision had already made up their minds prior to the pre-disciplinary meeting and the submission of Snowden's rebuttal.

To the extent Snowden suggests that the individuals who did make the discharge decision were merely rubber-stamping Korza's recommendation, making him the actual decisionmaker in fact if not in name, there is, again, no evidence to support such an inference. Snowden argues, for example, that we do not know whether anyone in the Department's Labor Relations office or at CMS even looked at her written rebuttal, let alone gave it meaningful consideration. It is true that the evidence presented to the district court on summary judgment does not identify who other than Wade reviewed Korza's discharge recommendation, nor does it disclose who, apart from perhaps Clark, reviewed Snowden's rebuttal. Indeed, we do not know which individuals were involved in the final decision to discharge Snowden nor what their decisionmaking process entailed. We know only that Department Secretary Dimas and CMS Director Hoffman signed the personnel action form discharging Snowden, but as Snowden suggests, their sign-offs likely were a mere formality. What limited evidence the parties have made available to us does not reveal what steps culminating in that formal action were taken after Korza submitted his discharge recommendation to the Labor Relations office along with Snowden's rebuttal.

But that gap in the evidence does not lend support to the notion that Korza was the true decisionmaker. Korza testified, without contradiction, that he did not have the authority to

make the discharge decision and that he passed along his recommendation (along with Snowden's rebuttal) to the office that did. Who in the Labor Relations office at the Department and at CMS took action on the recommendation and rebuttal was no doubt a matter that the parties did explore (or could have explored) in discovery, and those individuals could have been deposed. For example, Korza suggested at his deposition that Lori Simmons, Clark's bureau chief, and Simmons' counterpart at CMS were likely consulted as to the appropriate penalty or penalties for the fabrication of records. R. 20-8 at 21, Korza Dep. 84. An email chain between Korza and Clark also indicates that Wade consulted with Simmons after receiving Korza's June 21 memorandum recommending Snowden's termination. R. 24-1 at 6. Presumably Clark and those same individuals may have played some role in the discharge decision. But absent actual evidence of rubber-stamping by such individuals, we have no reason to question Korza's representation that his recommendation was *only* a recommendation, and that once he tendered it along with Snowden's rebuttal to the Labor Relations office, his involvement in the process was at an end, and the decision whether to discharge Snowden was for others to make.

We should add that Korza is the only defendant on the due process claim, so to the extent there are doubts about the sufficiency of the Department's (or CMS's) review of his discharge recommendation, it is not clear why he should be responsible for any shortcomings. *See Carmody v. Bd. of Trustees of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) ("Individual liability pursuant to [42 U.S.C.] § 1983 requires personal involvement in the alleged constitutional violation.") (cleaned up). Again, we understand Snowden's theory that Korza was the true decisionmaker, but on the record presented to us that

is simply a theory. Snowden has cited no evidence suggesting that the individuals to whom Korza's recommendation was presented did not meaningfully review his recommendation along with her rebuttal but instead simply rubber-stamped his recommendation.

In short, Snowden has not presented evidence sufficient to support an inference that she was deprived of procedural due process. She had notice of the charges resulting in her dismissal and was given an opportunity to be heard (in writing) on those charges. Any concern raised by the fact that Korza had already made up his mind that she should be discharged prior to the July pre-disciplinary meeting and the submission of Snowden's written rebuttal is resolved by the fact that he was not the individual authorized to make the discharge decision.

## III.

We affirm the district court's judgment.