In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 22-2462

RENE GALVAN, JR.,

*Plaintiff-Appellant,*

*v.*

STATE OF INDIANA and JOANIE
CRUM, Regional Manager, in her
official and individual capacities,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 19-cv-04446 — **Sarah Evans Barker,** *Judge.*

———————————

ARGUED MAY 31, 2023 — DECIDED SEPTEMBER 11, 2024

———————————

Before ROVNER, HAMILTON and SCUDDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Rene Galvan brought this federal
action against the defendants, including his former employer
the State of Indiana, and his former supervisor Joanie Crum
in her official and individual capacities. Galvan, a self-de-
scribed large Mexican male, alleged that in violation of Title
VII of the Civil Rights Act of 1964, he was discriminated

against and terminated from employment based on his race and sex, and was retaliated against based on his complaints of discrimination. He further alleges that Crum deprived him of his Fourteenth Amendment right to due process by terminating him without just cause and depriving him of his property rights without due process. He seeks relief under 42 U.S.C. § 1983 for the alleged constitutional violations. The district court granted summary judgment in favor of the defendants on those claims, and Galvan now appeals that determination to this court.

For six years, from December 2012 until November 2018, Galvan worked for the State of Indiana's Department of Child Services ("DCS"). He initially worked in the Hamilton County office as a family case manager and, in that position, was responsible for managing cases assigned to him but had no supervisory responsibilities. At the request of a supervisor in 2015, he transferred to the Madison County office, and at that location he was subsequently promoted to family case manager supervisor. In that role, he was responsible for supervising a team of family case managers and was supervised by the local office director of Madison County, who was supervised by the regional manager of Region 11. His regional manager was Dan Brumfield until the end of 2016, when Brumfield left. In April 2017, Joannie Crum was promoted to the position of regional manager, and remained in that position through Galvan's termination. In July of that same year, Madison County's local office director, Karen Blessinger, who had been Galvan's direct supervisor, left the office. Until December 2017, the position was covered on a temporary basis by relying on the local office directors of Hamilton County and Tipton County, who added that responsibility to their regular duties. In December 2017, Crum promoted Kathryn

Heman to the position. Galvan was terminated from his employment in November 2018.

Because Galvan is appealing the grant of summary judgment against him, we review the district court's judgment *de novo*, granting Galvan the benefit of a favorable review of the record evidence. *Snowden v. Illinois Department of Human Services*, 75 F.4th 789, 794 (7th Cir. 2023). In this appeal, even focusing exclusively on the facts as set forth by Galvan and the exhibits submitted by him in the briefing in the district court, including his deposition testimony, summary judgment against him on his claims was proper.

## I.

We turn first to his claim of discrimination in his termination from employment. As the district court recognized in addressing the motion for summary judgment, Galvan does not dispute the pertinent facts underlying any of the incidents which resulted in his discipline and termination. Instead, the parties dispute the interpretation of those incidents and his employment record as a whole. Galvan asserts that the record would permit a reasonable factfinder to find that the employment action was based on race or sex discrimination because he presented multiple types of circumstantial and direct evidence to support that determination. He points in particular to his record of evaluations that consistently characterized him as meets or exceeds expectations as evidence of his good work performance. The defendants maintain that there is no evidence that Galvan's termination was based on sex or race, and that the evidence establishes that Galvan's performance was deficient regarding his judgment as to child safety and

his lack of professional demeanor, which led to his termination.

Pursuant to Title VII, an employer is prohibited from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The only question for a district court on summary judgment is "whether the plaintiff has introduced evidence that would permit a reasonable fact-finder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Igasaki v. Illinois Dept. of Fin. and Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (internal quotation marks omitted).

The question, then, is not whether Galvan performed his job well in certain areas or at certain times—no one contests that he did. Nor is the question before us whether the employer was correct in determining that his behavior did not meet expectations and warranted his termination. As we have repeated often, the court "'is not a super personnel department that second-guesses employers' business judgments.'" *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 570 (7th Cir. 2017), quoting *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 895 (7th Cir. 2016); *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997). The focus is not on the wisdom of the decision, but on its genuineness. "[E]vidence that a defendant's explanation for an employment practice is 'unworthy of credence' is 'one form of circumstantial evidence that is probative of intentional discrimination.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (emphasis omitted), quoting

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000).

Ultimately, the sole question before us is whether the evidence in the record supports a finding that the termination was based on discrimination. Regardless of the evidentiary approach used by Galvan, the touchstone on summary judgment is always whether there is evidence of any kind that would allow a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. *Igasaki*, 988 F.3d at 957. Plaintiffs seeking to meet that burden have relied upon such circumstantial evidence as "'suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual.'" *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 761 (7th Cir. 2022), quoting *Rozumalski v. W.F. Baird & Associates, Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019). Plaintiffs may also rely on the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *Igasaki*, 988 F.3d at 957. Under that approach, if a plaintiff makes a prima facie case of discrimination, the burden shifts to the employer to offer a nondiscriminatory motive and, if the employer is able to do so, the burden shifts to the employee to show that the employer's proffered reason was a pretext. *Id*. Galvan eschewed the *McDonnell Douglas* approach in the district court, and again does not rely on it in this appeal. But he does argue, along similar lines, that the evidence of pretext as to the basis for the termination is one type of evidence that in the totality of the evidence can demonstrate discrimination.

To demonstrate that discrimination rather than poor work performance was the motive for his termination, Galvan points to his appraisals during his time of employment, which consistently rated him as "meets expectations" for many years. In *Igasaki*, the plaintiff similarly argued that the contrast between his past positive performance reviews from earlier years and his negative performance reviews under a new supervisor constituted evidence of discrimination. 988 F.3d at 959. We held that an employee's past performance was largely irrelevant, because the issue was not an employee's past performance but whether an employee was performing well at the time of the termination, *id*. (though more precisely, the issue is whether the employer *believed* that the employee was not performing well at the time of termination). We noted in *Igasaki* that past positive evaluations do not guarantee future employment, nor does such evidence without more show discrimination. *Id*. Therefore, it is not enough to merely show that in the past, his former supervisor evaluated his performance positively. Galvan would need to demonstrate that the employer did not genuinely believe its later evaluations that perceived the performance as inadequate.

Consideration of past appraisals can, however, provide some relevant context and can elucidate the expectations of behavior that the employer deemed deficient in the past. If the more recent negative appraisals were a stark contrast with the expectations expressed previously, that could be some evidence that the new evaluations were not genuine reflections of the employer's actual expectations, absent some explanation for the change. If, however, the deficiencies that triggered the termination involved the type of conduct deemed significant to the employer in past evaluations, that would tend to

support the employer's claim that the claim of deficient performance was genuinely believed.

In each of his appraisal reports from 2012 through 2016, Galvan received an overall rating of "meets" expectations, and even received an "exceeds" expectations a few times in the subcategory of teamwork. His appraisals consistently praised his work ethic and his teamwork abilities. Within those meet-expectations appraisals, he also received feedback as to areas to improve, which centered on strengthening communication skills and demonstrating professional conduct relating to safety reports, including noting that he: expressed frustration with professionals in communications relaying child safety concerns *(Doc. 109-3 at 2, 2013 Annual Appraisa*l); asked for guidance from all supervisors instead of following the advice of the first supervisor's response (*Id*. at 3); needed to work effectively with management even when he did not agree with allegations attached to reports (*Id*.); at times was visibly frustrated when given reports in which he disagreed and was encouraged to critically think and identify the safety concerns when a report is received rather than spend time discussing why it should not be a report at all (*Id. at 10, 2014 Annual Appraisal);* was too direct at times in his communication over the phone with professional report sources, and needed to consistently remain professional even when disagreements or misunderstandings arose (*Id*.); would show and state visible frustrations, at times in an unprofessional way, when he disagreed with management directives, and caused unneeded stress for management when he would continue to protest to assigning supervisors when he disagreed with a report determination even after a supervisor had already determined that there are safety concerns with the family *(Id. at 11);* used humor to break the tension in the office, which was

sometimes appreciated, but needed to work to ensure his approach to others is respectful when he says things in jest (*Id. at 22, 2015 Annual Appraisal*); and was laid back and joked a lot but that could make it difficult to tell when he is being serious *(Id. at 35, 2016 Annual Appraisal)*.

With the change of supervisors beginning in 2017, some of those appraisal categories fell to "does not meet" expectations, while others remained at the previous level of "meets" expectations. In his annual appraisal in 2017, he received "does not meet" expectations ratings in two categories. *(Doc. 109-3 at 46–53, 2017 Annual Appraisal)* First, in the category of Customer Service, that lower rating was based on complaints that had been received during the review period regarding his behavior with internal and external stakeholders, which contrasted with prior annual appraisals that had noted that there had not been concerns or complaints expressed from internal or external customers. The 2017 appraisal noted that Galvan was reluctant to accept constructive feedback from his manager, was accusatory and challenging and unreceptive to guidance at times, and was perceived as rude and disrespectful with hotline staff interactions. It further noted that two complaints were received that Galvan displayed challenging and verbally aggressive behavior with participants during a community meeting, where he questioned why reports were being made. Finally, the review noted that he responded inappropriately when directing a subordinate, loudly verbalizing publicly his frustration with a staff member. He also received a "does not meet" expectations rating in the area of Employee Relations. The explanation in this category noted that the reviewer had received complaints from staff members, managers, and hotline staff regarding Galvan being

challenging, verbally aggressive, and displaying a loss of composure and patience.

Galvan's next appraisal, and interim appraisal for the review period of January 2018 through June 2018, reflected an improvement to "meets" expectations in all areas. During that time period, however, in March 2018, Galvan received a Written Counseling relating that he failed to ensure the safety of an 8-week-old infant by failing to ensure that the family case manager was given appropriate guidance support and direction while on call. *(Doc. 109-3 at 60)*. Galvan had given approval for the family case manager to not complete a safety plan because, according to Galvan, the pediatrician had not expressed any concern with the infant's injury and explanation. The Written Counseling noted that the local office director, Heman, spoke with the pediatrician, who expressed imminent concerns regarding the injury, explanation, and lack of a safety plan, and that the pediatrician informed her that the concern was expressed at the time of the release. The Written Counseling noted that the result was that the child was left in a home without a safety plan where the parents did not acknowledge a concern. The Written Counseling noted that to correct those concerns, Galvan needed to review Chapter Four in policy and implement a process to ensure assessments are thoroughly initiated and children are safe before the family case manager leaves the assessment location. Galvan was also instructed to ensure that families with assessments have a safety plan or community action plan reviewed with them by the family case manager prior to ending the initial visit with the parent or caregiver, and to assure that child safety is the utmost priority.

Galvan received a second disciplinary action on October 1, 2018, in the form of a Written Reprimand. *(Doc. 109-3 at 62)* That report expressed concerns with Galvan's judgment regarding child safety, because Heman received information regarding a domestic violence assessment in which Galvan advised the family case manager to find that allegations were not substantiated. Further review by another family case manager supervisor determined it was necessary to remove the children and provide service to the family. The Written Reprimand indicated concern that Galvan failed to use critical thinking and good judgment when guiding the family case manager through the assessment regarding the safety of the children, and that Galvan did not thoroughly evaluate the assessment while utilizing the 4.22 Policy: Making an Assessment Finding. The Written Reprimand also took issue with Galvan's conduct as a supervisor. It related that during the period from September 5 through September 14, 2018, concerns were brought to the attention of the local office director that Galvan used negative statements toward staff. It further noted that Galvan admitted that he did not have time to "baby" staff and that it seemed to him that they had been babied by their previous supervisor. In his deposition, Galvan acknowledged that he told a staff member that he was not going to "baby" her and that such conduct was unprofessional of him, but Galvan asserted that he did not believe it warranted a written reprimand. *(Doc. 59-1, Galvan Dep. at 108, 115.)* The reprimand also provided that Galvan, as a family case manager supervisor, failed to address concerns with one of his family case managers in a professional manner, addressing those concerns in a group rather than in a one-on-one setting, and instead of addressing the situation as an opportunity for improvement, stating that the worker could be

written up or fired. His behavior was deemed to be unprofessional in violation of the Code of Conduct. He was tasked with taking corrective actions, including using the Safety Assessment Tool and Risk Assessment Tool to thoroughly evaluate all assessments, use the Safety Staffing Guide to best assess child safety during each safety staffing with his unit, and to review the Code of Conduct, Section IV, Supervising Employees. Galvan asserts that in November 2018, the state court determined that the children should not have been removed from the home, which was consistent with his initial recommendation. On November 8, he approached Crum to discuss reconsidering the written reprimand in light of that development, but before such a meeting could be pursued, she informed him that he would face a predeprivation meeting that day with respect to complaints made by a subordinate about him.

Those complaints, made on October 30, 2018, were by one of the subordinates Galvan was temporarily supervising, family case manager Kristina Nigg. She complained to Heman about the conduct of Galvan that had occurred on three occasions. She first related that on October 19, 2018, a unit breakfast that she attended with Galvan's team consisted of conversations making fun of coworkers, creating an uncomfortable situation for her. She further asserted that on October 25, 2018, she completed a placement and called Galvan for advice after finding out that the grandparents had custody of the child she was placing back into their care, and he stated that he would talk about it the next day. When she expressed concern to him the next day about why she had to wait for advice overnight when he was in the office until 8 pm that night, he advised her that she was thereby relaying to him that she was stressed and that she would not be able to handle

things after 4:30 pm. He further informed her that her assessments and detentions would start going on call, apparently meaning that they would be redistributed to other employees after that hour. Finally, Nigg related that on October 29, 2018, she was at an assessment for a drug-exposed infant and stepped outside the mother's residence to call Galvan. Another family case manager, Elise Wilson, remained in the room with the client and was a witness to what followed. Nigg stated that Galvan yelled at her on the phone—loudly enough to be heard through the phone by Wilson in the next room with the client—and told her not to have discussions with him in front of the client. She tried to clear up the situation with him, informing him that she was not in the room with the client, but he was dismissive of her claim and was adamant that she was in front of the family.

In response to those complaints by Nigg, Heman informed Galvan on October 30 via text message that he would no longer be supervising Nigg. Heman subsequently met with Galvan to discuss Nigg's complaints on Friday, November 2. As to the complaint relating to conduct on October 19,[1]

---

[1] Although the district court noted that it did not appear that the complaint as to the October 19 conduct – allowing the mocking of coworkers—was discussed at the November 2 meeting with Heman, Galvan's deposition testimony makes clear that it was discussed then. Galvan relates in his deposition the conversation he had with Heman regarding those allegations by Nigg. And according to the record that conversation could only have occurred at that November 2nd meeting. Galvan stated that the meeting on Friday, November 2, was the only opportunity that he had to speak with Heman between the time of Nigg's complaint on October 30 and his termination because Heman was unavailable to talk to him before November 2, and Heman never spoke with him after that date because she resigned from her job effective immediately on Sunday November 4.

Galvan explained in the deposition that his team was always making fun of other people, criticizing their work and how they did their work, and that he was present but was not a part of it in that he did not join their conversation. (*Doc. 59-1, Galvan Dep. at 163.*) He stated that Heman responded to him that he could not let that happen—could not let team members talk about other workers. (*Id. at 164*.) He agreed that he should have known that and that it was common sense, but stated that when the team members were having such conversations amongst themselves, he was not going to reprimand them when the conversations were with each other and not him.

Heman also discussed Nigg's complaints regarding the safety plan of October 25 and his manner of communicating with her. (*Id. at 155–57.*) Galvan stated that Heman showed him the safety plan from that date and asked him if he thought it was a good safety plan. Heman also told him that Nigg said he yelled at her and that he did not support her. He agreed that if he had seen that safety plan, he would not have accepted it and would have asked her to do another one, and he disputed her claim that he had not been supportive with her. (*Id. at 156*.) Galvan asked Heman if the situation was something that was going in the direction of being escalated from a discipline standpoint, and she replied that she did not know and that she was just trying to gather information about what happened with respect to Nigg. (*Id. at 136–37.*)

Because Heman resigned from her job over the weekend following that meeting, Galvan had no further communication with Heman beyond that point. On the following Thursday, November 8, Crum informed him that they were going to have a predeprivation hearing with him "about Ms. Nigg

and what happened with her a couple weeks ago," and he re-
sponded "Okay." (*Id. at 170*.) She informed him that he
needed to get a witness to attend with him, and he asked a
supervisor to accompany him, and that person agreed to do
so. In his deposition, Galvan stated that he knew what a pre-
deprivation hearing was but had never been a part of one. (*Id.
at 171*.) He stated that he knew that it was utilized where
someone was going to be subjected to a more serious disci-
pline like termination or days without pay or "things of that
nature," and that they would be finding facts in the hearing
to make that determination. *Id*. At that meeting, Heman and
Galvan discussed those complaints made by Nigg, and Gal-
van explained his perception of those incidents. Galvan stated
in his deposition that he was able to fully explain his version
of events regarding what happened with Nigg at the hearing,
and responded that there were no documents that he would
have submitted or witnesses that he would have wanted to
call because he did not have any. (*Id. at 172*.) In addition to
Galvan and Crum, the hearing was attended by an interim di-
rector, Ms. Crumbaugh, and Galvan's witness. (*Id. at 170,
173*.) Following the hearing, the decision was made to termi-
nate Galvan, and Crum informed Galvan of the determination
that day. The termination letter subsequently provided to him
stated that he failed to provide appropriate supervision to an
employee in the field nor did he provide appropriate over-
sight and guidance around safety planning. It further de-
clared that he did not follow procedure regarding safety staff-
ing or review safety plans created by the family case manager
regarding assessment. The conduct was deemed to violate the
Code of Conduct, policy 4.41, 4.18, and 4.19 and resulted in
the determination to terminate his employment.

Galvan asserts that the termination was based on race and sex discrimination, asserting that he is a large Mexican male who can be wrongly perceived as scary or intimidating. He has no direct evidence that his termination was based on race or sex discrimination and disclaims reliance on the *McDonnell-Douglas* test to raise an inference of discrimination, although some of his arguments mirror that approach. He relies on circumstantial evidence, and particularly focuses on the argument that a discriminatory motive can be inferred where the employer's reason for the termination lacks a basis in the record.

That argument cannot withstand scrutiny of the record. As set forth above, the record demonstrates a number of comments through the years relating to the conduct that led to his termination. Even in the earlier years under the previous supervisor, his evaluations which found that he "meets expectations" nevertheless repeatedly included comments regarding Galvan's professionalism relating to communication and safety reports. After he became a supervisor, the record reveals that his supervisor received complaints regarding his interactions from internal and external customers, including complaints from participants regarding behavior during a community meeting, hotline staff, managers, staff members, and subordinates, as well as a concern expressed by a pediatrician.

Galvan argues that those complaints were wrong and that his conduct was proper. He points, for instances, to the written reprimand, contending that the state court's later decision validated his position, and he argues that a family case manager was violating procedures in calling after hours when he rebuffed her, and that Nigg failed to produce the safety

assessments when asked by him to do so. His argument that the subordinates were at fault because they were violating procedures would miss the mark even if their fault was relevant, because the complaints concerned his tone and manner in addressing the subordinates and other persons, and his failure to follow the process and ensure proper preparation of safety reports.

Moreover, his arguments on those bases miss the point. The question is not whether the employer was right in siding with the complainants, and it is not whether he was a good employee or one who needed to be terminated. The relevant question is whether the record supports his claim of discrimination, and specifically as argued by Galvan, whether the record lacks support for the employer's claim that the termination was based on his performance such that it would support an inference of a discriminatory reason. Here, the record reveals complaints regarding his performance by third parties who interacted with him, and he has not argued that those complainants themselves possessed any discriminatory motive. Galvan does not argue that the complainants were conspiring with the supervisor to falsely accuse him of improper behavior, or that they were involved in the termination decision in any way. Therefore, the record reflects that individuals uninvolved in the termination decision complained of problematic behavior by Galvan, and the employer investigated and credited those complaints. Moreover, the complaints were consistently regarding his professionalism in communicating, in reviewing and assessing safety plans in a timely manner, and in his ability to follow the process even when he disagreed with it. That problem is not extinguished by proving that the ultimate determination was correct, or that the subordinate was also at fault. And Galvan acknowledged the

validity of many of the complaints that appear in his annual appraisal and his written reprimand, including hanging up on a subordinate calling for help, loudly scolding a subordinate whom he believed was calling in front of the family, stating that he would not "baby" his team members, failing to intervene when team members regularly mocked coworkers, and being the "why guy," regularly questioning determinations as to safety plans and procedures made by supervisors, and failing to both ensure that Nigg provided the safety assessment in a timely manner and to review it before Heman presented it to him. The purported reason for the termination decision is consistent with the complaints made in those prior adverse determinations and thus does not lack support in the record such as would support an inference of discrimination.

Nor does Galvan provide any other circumstantial evidence that would allow a jury to conclude that the termination was motivated by discrimination. He complained in the district court that he was not chosen for a transfer on four occasions but does not develop that argument in his brief to this court. Those denials do not therefore support an inference of race or sex discrimination. Galvan has failed to identify any other circumstantial evidence in the record that, considered in the totality of the record as a whole, would support an inference of race or sex discrimination. The district court properly granted summary judgment to the defendants on those claims.

Finally, this not a case in which the circumstances themselves cast doubt on the genuineness of the employer's alleged motivations, or the employer enforces the policy in an objectively unreasonable manner, such as would allow a jury to infer pretext. See *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285

(7th Cir. 1999), *Huff v. Buttigieg*, 42 F.4th 638 (7th Cir. 2022). In *Stalter*, the employee had eaten some chips from an open bag left on the countertop in the lunchroom, the owner of the chips who then retrieved the bag considered it "no big deal," and evidence established that open food left on the table in the lunchroom was considered by employees to be abandoned and available for others to eat. *Id*. at 287. Wal-Mart characterized Stalter's actions, in eating some chips from a bag, as theft and therefore "gross misconduct," and terminated him without first imposing any lesser level of discipline. *Id*. at 287–88. Stalter had presented evidence that Wal-Mart had not terminated another employee who committed gross misconduct, so its claim that it was mandatory to terminate him did not "pass the straight-face test." *Id*. at 290–91. Moreover, we noted that the discipline in light of the alleged infraction was "akin to swatting a fly with a sledge hammer." *Id*. at 290. We held that those circumstances were sufficient to demonstrate an issue of fact as to pretext which would allow an inference of discrimination. *Id*. at 291–92. Thus, when the basis for the termination is objectively unworthy of belief, a jury may infer pretext. See also *Huff*, 42 F.4th at 648 ("[a] jury may infer pretext when an employer enforces a policy in an objectively unreasonable way.")

Here, we have no such circumstances. Galvan has not identified other employees for whom similar actions yielded a more permissive disciplinary result. He admits that he never reviewed the safety plan prepared by Nigg even though a number of days had passed. Although he claims that Nigg repeatedly did not have the safety plan when asked for it, as the supervisor it was Galvan's responsibility to conduct that review and thus, considered objectively, his actions in failing to acquire the safety plan and review could be

considered deficient. Moreover, he had received lesser sanctions in the form of a written counseling and a written reprimand, as well as a Needs Improvement appraisal designation, for shortcomings relating to safety plans and supervision. The seriousness of a safety plan is obvious, so we are not presented with a trivial infraction of no import. In short, this case does not present the type of objectively unreasonable action by an employer that would signal pretext and allow an inference of discrimination. On this record, the district court did not err in granting summary judgment to the defendants as to the discrimination claims.

## II.

Galvan also alleges a claim of retaliation. In order to survive summary judgment on such a Title VII retaliation claim, Galvan must produce evidence from which a reasonable jury could find that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action. *Alley v. Penguin Random House*, 62 F.4th 358, 361 (7th Cir. 2023). He asserts that he engaged in a statutorily protected activity when he complained in August 2018 that he believed he was being treated differently because he is Mexican and a "big guy, scary looking, according to people." He also asserts that on the day of his termination, November 8, he complained to Crum, but the only "complaint" that day was that his written reprimand should be reconsidered in light of a court case reversing the children's removal from the family. That November 8 complaint, which did not involve any claim of race or sex discrimination at all, was not a statutorily protected activity and is not relevant to the retaliation claim. We focus therefore on the August 2018 complaint,

which is the only discrimination complaint properly set forth in the record. Galvan asserts that the written reprimand and termination constituted retaliation for that complaint which constituted protected activity. The reprimand had no adverse impact on his employment, so we consider only his claim that there was a causal connection between the complaint and his termination. See *Scaife v. United States Dept. of Veterans Affairs*, 49 F.4th 1109, 1119 (7th Cir. 2022) (in a retaliation claim, "a documented reprimand alone is not an adverse action '[a]bsent some tangible job consequence.'"); *Muldrow v. City of St. Louis, Missouri*, 601 U.S. ___, 144 S. Ct. 967, 975–76 (2024). The record does not support any such causal connection. Galvan relies on suspicious timing and the pretextual nature of the termination decision as support for that causal connection, but we have already held that the record does not support pretext in this case, and suspicious timing alone "is generally insufficient to establish a retaliatory motivation." *Jokich v. Rush Univ. Med. Ctr.,* 42 F.4th 626, 634 (7th Cir. 2022). Here, a complaint by a third party, Nigg, triggered the investigation and termination, thus further negating the argument that the termination was causally connected to his complaint months before. *Id*. (noting that "any inference of causation supported by temporal proximity may be negated by circumstances providing an alternative explanation for the challenged action.") Galvan has presented insufficient evidence to support his claim of retaliation, and the district court properly granted summary judgment on that claim as well.

## III.

Finally, Galvan also asserts that the district court erred in granting summary judgment against him on his claim that he was denied procedural due process in his termination. He

alleges that the termination of his employment constituted a deprivation of a property interest without due process.

The path to summary judgment on this issue in the district court was a tortured one. In the defendants' initial motion for summary judgment on the discrimination and due process issues, their brief lacked any argument as to the due process claim. Accordingly, the district court denied summary judgment as to that claim but granted it as to the discrimination claim. The defendants then filed a second motion for summary judgment, arguing this time that Galvan's due process claim should fail because: (1) Galvan lacked a property interest in his employment under the Fourteenth Amendment; and (2) the named defendants were not amenable to suit under the Constitution. The defendants also argued that defendant Crum was entitled to qualified immunity from the suit. The defendants did not develop any argument that Galvan was provided with sufficient process under the Constitution beyond a single sentence, in the argument as to the property interest, stating that the plaintiff was provided notice and a predeprivation meeting.

The plaintiff in response to that summary judgment motion refuted the defendants' arguments for summary judgment and also argued that the process provided to him failed to meet the standard of due process. In their Reply in Support of Summary Judgment, the defendants finally argued on the merits that the predeprivation procedures provided to Galvan satisfied the requirements of due process. Galvan submitted a surreply, again arguing that the procedures provided to him pre-termination failed to comport with the requirements of the Due Process Clause.

The district court held that the pre-termination proceedings made available to Galvan comported with the limited due process standards applicable in this context. The district court also held, in the alternative, that if the predeprivation procedures required by the Indiana State personnel policies were not followed, then the actions of the employees providing that predeprivation hearing were "random and unauthorized," and that Galvan had not challenged the adequacy of the post-deprivation remedy—namely a full adversarial evidentiary hearing before the Indiana State Employees' Appeals Commission ("SEAC") that occurred two years after his termination. Neither party had argued that the defendant's actions were random and unauthorized, nor that the post-termination proceedings were sufficient, and Galvan argues that the district court erred in relying on an argument not raised by the parties without providing the parties notice and an opportunity to respond. See Fed. R. Civ. P. § 56(f)(2). We need not address that alternative holding, however, because we agree that the predeprivation procedures in this case satisfied the requirement of due process.

In order to demonstrate a violation of procedural due process, a plaintiff must establish "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) the failure to employ constitutionally adequate procedures." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 627 (7th Cir. 2016). The parties do not dispute that Galvan possessed a property interest in his employment, and indeed the terms of his employment provided that he could be discharged only for cause. See *Cheli v. Taylorville Cmty. School Dist.*, 986 F.3d 1035, 1039 (7th Cir. 2021) (noting that generally a protected property interest in the employment context arises where the terms of employment allow

termination only for cause or otherwise evidence a mutually explicit understanding of continued employment); *Perry v. Sindermann*, 408 U.S. 593, 602–03 (1972).

The next step in analyzing such a claim is to determine what process was due. In *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the Supreme Court held that the determination as to what process is due requires a balancing of three factors: first, the private interest at stake in the deprivation; second, the risk of an erroneous deprivation and the value, if any, of additional procedural safeguards; and finally, the government's countervailing interests. In the employment context, the private interest at stake is high where termination of employment is involved, and a predeprivation hearing can alleviate the risk of erroneous deprivation, often with little additional burden to the employer. Accordingly, an employee "ordinarily has the right to notice and a reasonable opportunity to respond prior to termination," even where post-deprivation remedies are available, where such hearing is feasible and practical. *Chaney v. Suburban Bus Div. of Reg'l Transp. Auth.*, 52 F.3d 623, 628 (7th Cir. 1995); *see also Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 542 (1985). That procedure "'need not be elaborate and can be satisfied with less than a full evidentiary hearing.'" *Chaney*, 52 F.3d at 628, quoting *Buttitta v. City of Chicago*, 9 F.3d 1198, 1202 (7th Cir. 1993); *see also Loudermill*, 470 U.S. at 545. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (internal quotation marks omitted) *Mathews*, 424 U.S. at 333; *Snowden*, 75 F.4th at 794.

Where a post-termination process is available to allow an employee to challenge his termination, "the purpose of a pre-

termination hearing is not to definitively resolve whether discharge is appropriate, but rather to serve as 'an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" *Snowden*, 75 F.4th at 794, quoting *Loudermill*, 470 U.S. at 545–46. The essential components of such a hearing are notice of the grounds for the proposed termination and an opportunity to respond to those grounds prior to termination. *Id*. at 795; *Loudermill*, 470 U.S. at 546. Both components of that pre-deprivation process, the notice and the response, can be either oral or written. *Id*. The process need not be elaborate and is sufficient if it makes the employee aware of the charges he is facing and provides him an adequate opportunity to respond to those charges before he is terminated. *Id*.

Galvan argues that the procedures provided to him denied him adequate notice and a meaningful opportunity to be heard. He focuses on the events of November 8, the day of the hearing and the termination, and argues that Crum's statement that he was going to be subjected to a predeprivation hearing to address "what happened with Nigg a couple of weeks ago" was insufficient to provide notice of the complaint against him for which he was subjected to discipline. He asserts generally that the predeprivation procedures failed to provide him adequate notice of the charge and the potential discipline and an opportunity to be heard.

Taken in isolation, Crum's vague statement as to the subject of the hearing would be insufficient to satisfy due process. But context matters, and the events of November 8 were a continuation of a process that began on November 2. On that day, he was fully apprised of the complaints registered by

Nigg regarding his conduct and had an opportunity to review and address those complaints with Heman. That exposure to the details of her complaints and the opportunity to gather his thoughts in response are the backdrop against which the November 8 predeprivation hearing was conducted. Crum's statement as to the subject of the hearing was not vague or indeterminable in light of the discussion of Nigg's complaints with Heman on November 2. And that meeting on November 2 ensured that he would not be blindsided by the charges without the opportunity to gather his thoughts in rebuttal. Moreover, he was aware based on that conversation with Heman that an escalation in discipline was possible. Nothing in the record supports a holding that he lacked an understanding of the nature of the complaint against him or that he lacked the opportunity to fully present his response to the charges. In fact, Galvan's own deposition statements support a contrary conclusion in that, by his own testimony, he was aware that predeprivation hearings signaled serious discipline including termination, he was able to fully explain his version of events regarding what happened with Nigg at the hearing, and he could not identify any documents that he would have submitted or witnesses that he would have wanted to call. The record therefore does not support his argument that he lacked notice and a meaningful opportunity to be heard prior to termination. As we stated, the purpose of the predeprivation hearing is as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Loudermill*, 470 U.S. at 545–46; *Gilbert v. Homar*, 520 U.S. 924, 929 (1997). The pretermination hearing in this case fulfilled that role, and a post-deprivation remedy was available

to challenge the termination which included a full evidentiary hearing. Galvan availed himself of that right, but his termination was upheld following that full evidentiary hearing. The requirements of due process were fulfilled by those procedures.

## IV.

Accordingly, the district court properly granted summary judgment to the defendants, and the decision of the district court is AFFIRMED.